**Slip Op. 02-25**

# UNITED STATES COURT OF INTERNATIONAL TRADE

_____

|  |  |  |
|---|---|---|
| AG der DILLINGER HÜTTENWERKE, EKO STAHL GmbH, SALZGITTER AG STAHL und TECHNOLOGIE, STAHLWERKE BREMEN GmbH, and THYSSEN KRUPP STAHL AG, | : : : : : : | |
| Plaintiffs, | : : | |
| v. | : : : | |
| THE UNITED STATES, | : : : : | Court No. 00-09-00437 |
| Defendant, | : : : | |
| v. | : : : | |
| BETHLEHEM STEEL CORPORATION, and UNITED STATES STEEL LLC | : : : : | |
| Defendant-Intervenors. | : : | |

_____

[ITA's countervailing duty sunset determination remanded.]

Dated: February 28, 2002

DeKieffer & Horgan (J. Kevin Horgan and Marc E. Montalbine) for plaintiffs.

Robert D. McCallum, Jr., Assistant Attorney General, David M. Cohen, Director, A.David Lafer, Senior Trial Counsel, Commercial Litigation Branch, Civil Division, United States Department of Justice, (John C. Einstman), Boguslawa B. Thoemmes and Edna Boyle-Lewicki, Office of the General Counsel, United States Department of Commerce, of counsel, for defendant.

Dewey Ballantine LLP, (John A. Ragosta and John W. Bohn) for defendant-intervenors.

**OPINION**

**RESTANI, Judge:**

This matter is before the court on a motion for judgment based upon the agency record pursuant to USCIT Rule 56.2.  The motion has been brought by AG der Dillinger Huttenwerke ("Dillinger"), EKO Stahl GmbH, Salzgitter AG Stahl und Technologie, Stahlwerke Bremen GmbH and Thyssen Krupp Stahl AG (collectively "Plaintiffs"), respondents in a countervailing duty ("CVD") investigation.[1]  See Certain Steel Products from Germany, 58 Fed. Reg. 37,315 (Dep't Comm. 1993) (final determ.) [hereinafter "Final Determination"].   At issue is the final determination by the Department of Commerce ("Commerce" or the "Department") pursuant to sunset review under 19 U.S.C. § 1675(c).  See Certain Corrosion-Resistant Carbon Steel Flat Products; Cold-Rolled Carbon Steel Flat Products; and Cut-to-Length Carbon Steel Plate Products from Germany, 65 Fed. Reg. 47,407 (Dep't Comm. 2000) (final sunset rev.) [hereinafter "Sunset Determination"].  Plaintiffs challenge the Sunset Determination principally on the following grounds:  (1) Commerce improperly shifted the burden of proof to Plaintiffs to prove that the benefits under certain programs were not likely to continue; and (2) Commerce erred in not taking into account changes in law that took place subsequent to the initial investigation.

**JURISDICTION & STANDARD OF REVIEW**

The court has jurisdiction pursuant to 28 U.S.C. § 1581(c) (1994).  The court will uphold

---

[1]  The German producers of corrosion-resistant flat products are listed in the Final Determination as follows:   EKO Stahl GmbH, Salzgitter AG Stahl und Technologie, Stahlwerke Bremen GmbH and Thyssen Krupp Stahl AG.  The German producers of cut-to-length carbon steel plate are listed as follows:  AG der Dillinger Huttenwerke, Ilsenburg, Preussag and Thyssen.

Commerce's determination in countervailing duty investigations unless it is "unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B).

## FACTUAL & PROCEDURAL BACKGROUND

On June 30, 1992, the domestic steel industry, Bethlehem Steel Corporation and United States Steel LLC (collectively "domestic producers" or "petitioners") filed petitions with Commerce alleging that the Government of Germany ("Germany") was providing countervailable subsidies to its steel industry through various subsidy programs. Commerce subsequently conducted a countervailing duty investigation, and on July 9, 1993, issued a final affirmative determination that countervailable benefits had in fact been provided by Germany to its steel industry.[2] See Final Determination, 58 Fed. Reg. at 37,315. The period of investigation ("POI") for which subsidies were measured was 1991.

On September 1, 1999, Commerce initiated sunset reviews of the countervailing duty orders on corrosion-resistant and cut-to-length steel products from Germany.[3] See Initiation of

---

[2] The products covered by this investigation included four separate classes of merchandise: (1) certain hot-rolled carbon steel flat products (2) certain cold- rolled carbon steel flat products, (2) certain corrosion-resistant carbon steel flat products, (3) certain cut-to-length carbon steel plate. In the Final Determination, Commerce determined the following net countervailable subsidies: for hot-rolled carbon steel products, 1.06% AV; for cold-rolled carbon steel products, 0.84 % AV; for corrosion-resistant carbon steel flat products, 0.59% AV; for cut-to-length carbon steel plate, 14.84% AV (country-wide including Dillinger). Final Determination, 58 Fed. Reg. at 37,326. Company specific rates for producers of corrosion-resistant carbon steel flat products were calculated as follows: 0.80% AV for Ilsenburg, 1.72% AV for Preussag, and 0.50% AV for Thyssen. Id.

[3] At the same time, Commerce initiated a sunset review of the countervailing duty order on cold-rolled carbon steel products from Germany. The International Trade Commission ("ITC" or the "Commission") determined that revocation of this countervailing duty order would

(continued...)

Five-year ("Sunset") Reviews of Antidumping and Countervailing Duty Orders or Investigations of Carbon Steel Plates and Flat Products, 64 Fed. Reg. 47,767, 47,768 (Dep't Comm. 1999); see also Transition Orders; Final Schedule and Grouping of Five-Year Reviews, 63 Fed. Reg. 26,779, 26,786 (Dep't Comm. 1998).[4]

On September 10, 1999, the domestic producers including Bethlehem Steel Corporation and U.S. Steel Group, a unit of USX Corp. (collectively "Defendant Intervenors"), filed notices of intent to participate in the sunset reviews. See P.R. Docs. 531, 533. The German producers filed notices of intent to participate on September 28, 1999. See P.R. Docs. 552, 553. On September 30, 1999, the Commission of the European Communities and the Government of Germany submitted substantive responses to the notice of initiation. See P.R. Docs. 577-78, 603.[5] On October 1, 1999, substantive responses were submitted by the German producers and

---

[3](...continued)
not be likely to lead to recurrence of injury to the U.S. industry. Accordingly, this order was revoked and is not the subject of this action.

[4] Transition orders are those orders in effect on January 1, 1995, the effective date of the Uruguay Round Agreements Act. Commerce is obligated to initiate sunset reviews for all transition orders between July 1998 and December 31, 1999, and to complete those reviews by June 30, 2001. See Policies Regarding the Conduct of Five-year "Sunset Reviews of Antidumping and Countervailing Duty Orders, 63 Fed. Reg. 18,871, 18,872 (Dep't Comm. May 14, 1998) [hereinafter "Sunset Policy Bulletin"]. Transition orders are treated as if issued on January 1, 1995. See 19 U.S.C. § 1675(c)(6)(D).

[5] In its substantive response, the Government of Germany stated that there would not be any negative impact from the revocation of the countervailing duty orders because many of the programs previously investigated by Commerce had either been terminated or were non-actionable "green-light" subsidies under the WTO Agreement on Subsidies and Countervailing Measures. See Pl. App. Tab 2 at 3-7. The Government of Germany also informed Commerce of a European Commission decision prohibiting the granting of aid to the steel industry except for circumstances involving the closing of facilities, the adaptation of existing facilities to new environmental standards or research and development. Pl. App. Tab 2 at 3 (citing Commission

(continued...)

the domestic producers.  See P.R. Docs. 555, 556, 558, 560, Pl. App. Tabs 3, 4.   Rebuttals to the

substantive responses were filed by the various parties on October 15, 1999.  See P.R. Docs.

593-602, 608.  Having deemed the responses "adequate," Commerce decided to conduct a "full

sunset review" rather than an abbreviated, expedited sunset review based on the facts available.

See Sunset Determination at cmt. 1.

On November 9, 1999, the domestic producers filed a submission contesting Commerce's

decision to conduct a full sunset review.  See P.R. Doc. 632.   On March 14, 2000, the German

producers filed a submission discussing a pending decision of the WTO dispute settlement panel

and a decision issued by the U.S. Court of Appeals for the Federal Circuit, both of which related

to Commerce's change-in-ownership methodology.  On March 16, 2000, the domestic producers

submitted comments in response to the claims made in the German producers' March 14

submission.  See P.R. Doc. 723.  On March 17, 2000, the German producers filed a submission

regarding the allocation period from the German depreciation schedule, which had been used in

Steel Wire Rod from Germany, 62 Fed. Reg. 54,990 (Dep't Comm. Oct. 22, 1997) (final determ.)

[hereinafter "Steel Wire Rod"].

On March 20, 2000, Commerce issued its preliminary results of the sunset review.[6]

Certain Corrosion-Resistant Carbon Steel Flat Products; Cold-Rolled Carbon Steel Flat Products;

---

[5](...continued)
Decision 2496/96 (Dec. 18, 1996)).

[6] Commerce preliminarily determined the following net countervailable subsidies pursuant to sunset review:   0.55 % AV for cold-rolled carbon steel flat products; 0.54% AV for corrosion-resistant carbon steel flat products, 14.84% AV country wide (including Dillinger), 1.62% AV for Salzgitter, and 0.5% AV for TKS.  Commerce did not review hot-rolled carbon steel products.

and Cut-to-Length Carbon Steel Products from Germany, 65 Fed. Reg. 16,176 (Dep't Comm.

March 27, 2000) (prelim. sunset determ.) [hereinafter "Preliminary Sunset Determination"]. In

the Preliminary Sunset Determination, Commerce determined that revocation of the

countervailing duty orders would be likely to lead to continuation or recurrence of a

countervailable subsidies. Id. Commerce indicated that it relied on rates determined in the

original investigation because no administrative review of the orders had been conducted. Id. at

§ II. Commerce found that grants were made under the Capital Investment Grants ("CIG")

program after 1986, producing a benefit stream that would last beyond the end of the sunset

review. Id. at § I.1.

After the preliminary results, counsel for the German producers contacted Commerce to

request that the calculation memoranda from the original investigation be made part of the

administrative record in the sunset reviews to clarify the issue of whether benefits were given

after 1986. On April 13, 2000, counsel for the German producers made this request in writing.

See Pl. App. Tab 9. In late April of 2000, the Government of Germany submitted its

questionnaire response from the original investigation and verified information from the Steel

Wire Rod investigation explaining Germany's regional assistance programs. See Pl. App. Tab

10.

On April 25, 2000, Commerce issued a letter returning the March 11 and March 17, 2000

submissions and striking them from the record, on the ground that it "normally will not accept or

consider any additional information from a party after the time for filing rebuttals has expired

unless the Secretary requests additional information from a party after determining to proceed to

a full sunset review." See P.R. Docs. 742-43, Pl. App. Tab 11 at 1 (citing 19 C.F.R. §

351.218(d)(4)). On April 28, 2000, the domestic producers submitted its response to the German producers' request to place the calculation memoranda on the sunset review record. See P.R. Doc. 763, Pl. App. Tab 12. The response included portions of a questionnaire response of one of the German companies from the original investigation. Id.

On May 2, 2000, counsel for the German producers met with Commerce staff and again requested the inclusion of the calculation memoranda in the administrative record. In May 2000, the Government of Germany and the rest of the interested parties timely submitted case briefs. In early June 2000, all parties timely submitted post-preliminary determination rebuttal briefs, and a hearing was held on June 26, 2000.

On July 11, 2000, Commerce issued a letter striking the portion of the submissions from the record pertaining to "new factual information and/or materials . . . submitted in another proceeding." P.R. Doc. 849, Pl. App. Tab 15. In the same letter, Commerce indicated that it decided to keep in the sunset review record "the portion [of the submission] which were parts of the record in the original investigation of the orders, because they were submitted in connection with the original investigation and it is our practice to use information contained [in] the record of the investigation, where appropriate." Id.

On July 27, 2000, Commerce issued the final results pursuant to sunset review. Sunset Determination, 65 Fed. Reg. 47,407. In the Sunset Determination, Commerce determined that revocation of the countervailing duty orders would be likely to lead to continuation or recurrence of countervailable subsidies. Id. at 47,408. Commerce maintained the rates arrived at in the Final Determination for cut-to-length carbon steel products. See Sunset Determination at Background Section. With respect to corrosion-resistant carbon steel flat products, however,

Commerce made adjustments to the net subsidy rate for this class of subject merchandise by deducting the subsidy rates attributable to these programs.[7]

On December 15, 2000, Commerce published notice of the continuation of countervailing duty order. See Certain Carbon Steel Products from Germany, 65 Fed. Reg. 78,469 (Dep't Comm. 2000).

## DISCUSSION

### I. Scope of Commerce's Inquiry pursuant to Sunset Review

Under the Capital Investment Grants program, the Government of Germany provided grants to the iron and steel industry amounting to 20% of the acquisition cost of assets purchased or produced prior to January 1, 1986, and ordered or produced after July 30, 1981. Under the Investment Premium Act ("IPA"), grants (or "investment allowances") were provided to companies investing in three specific regions of Germany, calculated as a percentage of eligible expenditures in these areas. Companies were eligible for grants under the IPA only for investments made prior to January 1, 1991. In the Final Determination, after finding the grants

---

[7] Pursuant to Sunset Review, Commerce maintained the Final Determination's country-wide (including Dillinger) rate of 14.84% AV for cut-to-length carbon steel plate. Commerce did make adjustments, however, to the net countervailable subsidies for certain producers of cut-to-length carbon steel plate. Specifically, Commerce adjusted rates as follows: for Ilsenburg to 0.80%, for Preussag to 0.77% AV, and for Thyssen (TKS) to 0.51% AV based on (1) findings in the original investigation regarding termination of three recurring subsidy programs (namely, the Structural Improvement Aids, the Zonal Area, and the Ruhr District Action Plan); and (2) a lack of evidence to controvert the Government of Germany's contentions that these programs had been terminated. Sunset Determination at cmt. 7. Commerce noted that "although Salzgitter is a successor-in-interest for both Ilsenburg and Preussag, without an appropriate review, we cannot discern the appropriate rate for the successor. Therefore, for Ilsenburg and Preussag, we are reporting the rates from the original investigation, as adjusted. Dillinger takes the country-wide rate, and TKS is the successor in interest of Thyssen." Sunset Determination at Final Results Section.

given under these programs countervailable, Commerce deemed the benefits received

"nonrecurring," and therefore allocable over fifteen years in accordance with 19 C.F.R. §

351.524.  Final Determination at 37,316.

Pursuant to the sunset review, Commerce determined that benefit streams from the CIG

and IPA programs continue beyond the end of sunset review.   Commerce agreed with the

domestic interested parties that certain manufacturers of the subject merchandise received "some

benefits" from both the CIG and the IPA after January 1, 1985.  Sunset Determination at cmt. 7.

The German producers had argued that the benefits received under the CIG and/or IPA after that

date were so small that they should be expensed in the year they were received.   Commerce

rejected this argument on the ground that "the record of these sunset reviews is not sufficient for

us to definitively conclude whether [those benefits] were less than 0.5% of the corresponding

beneficiary's annual net sales."   Id.  Commerce further found that "since no administrative

reviews of the orders were conducted, we are unable to determine whether any additional benefits

under these programs were received subsequent to the period of investigation."  Id.  Based on

these findings, Commerce concluded that "the benefit streams from the Capital Investment

Grants and Investment Premium Act Programs were likely to continue beyond the end of sunset

review, and that, therefore, a countervailable subsidy from the CIG and IPA to manufacturers of

subject merchandise would be likely if the orders were revoked." Id.[8]   Plaintiffs dispute this

---

[8] Accordingly, Commerce determined that "the only programs which were found in the investigations to provide countervailable benefits . . . that have ceased to exist without any residual benefits are the Structural Improvement Aids, Ruhr District, and TRA/BvS with respect to corrosion-resistant and/or cold-rolled steel products and Zonal Area with respect to all steel products." Sunset Determination at cmt. 7. See also note 7, supra.

determination on the ground that Commerce impermissibly shifted the burden of proof to the

Plaintiffs to show that the countervailable subsidies were *not* likely to continue or recur.

Plaintiffs argue that by ignoring evidence of actual amounts given under the programs and of

amortization of non-recurring benefits calculated in the original investigation, Commerce

erroneously presumed that the benefit of almost all of the programs examined in the original

investigation would continue undiminished after the end of the sunset review (July 27, 2000).

Plaintiffs contend that Commerce erred in refusing to consider the following evidence:   (1)

information from a questionnaire submitted in the original investigation regarding amounts

actually given to Preussag (predecessor to Salzgitter AG Stahl und Technologie) under the two

programs after January 1, 1985; and (2) the calculation memoranda supporting the original CVD

rate determination showing "the precise subsidy amount received by each producer in every year

up to and including the 1991 period of investigation," as well as "annual net sales and . . . results

of the expense test."  Pl. Br. at 19.

Commerce counters that it did not presume or even determine that the non-recurring

benefits at issue would continue undiminished, as such a determination would require

calculations outside the scope of a sunset review.   Commerce asserts that the legislative history

and the regulations prevent it from making adjustments to the original CVD rate except under

"extraordinary circumstances," which do not apply in this case.  Commerce adds that even if it

were permitted to make adjustments to the original CVD rate in this case, the record evidence

was not sufficient to enable Commerce to do so.    Defendant Intervenors further assert that there

is a presumption that subsidization will continue or recur at the original CVD rate, and that

Plaintiffs failed to rebut the presumption.   Def.-Int. Br. at 9.  The court finds that Commerce

misconstrues: (A) the evidentiary burden applicable to its likelihood determination; and (B) the scope of its discretion to make adjustments based on that evidence.

## A. Evidence Supporting the Likelihood Determination pursuant to Sunset Review

Pursuant to sunset review, Commerce must determine the likelihood of continuation or recurrence of a subsidy deemed countervailable in the original investigation if the order issued pursuant thereto were to be revoked. In the absence of an affirmative determination in this regard, the statute directs that the countervailing duty order be revoked. See Section 1675(d)(2) ("In a [sunset review], the administering authority shall revoke a countervailing order . . . unless (A) the administering authority makes a determination that . . . a countervailable subsidy . . . would be likely to continue or recur[9], and (B) the Commission makes a determination that material injury would be likely to continue or recur . . . .").[10] The statute, however, does not charge any interested party with the ultimate burden of persuasion, or otherwise create a presumption that a countervailable subsidy is or is not likely to continue or recur if the order is revoked.[11] See Eveready Battery Co., Inc. v. United States, 77 F. Supp. 2d 1327, 1330 (Ct. Int'l

---

[9] Commerce made no findings pursuant to the sunset review regarding the likelihood of recurrence, as opposed to continuation.

[10] The ITC made an affirmative finding of continuation/recurrence of material injury with respect to both cut-to-length steel plate and corrosion-resistant carbon steel flat product. The ITC made a negative finding with respect to cold-rolled carbon steel flat products. This order was revoked and is not subject to this court action.

[11] See Final Rule, 19 C.F.R. Parts 351, 353, and 355, Antidumping Duties; Countervailing Duties, 62 Fed. Reg. 27,296, 27,324-25 (Section 351.218) ("[W]e do not agree with the statement . . . that there is an internationally agreed preference for the revocation of old orders. . . . [W]e do not find [a source for this preference] in either the Antidumping Agreement

(continued...)

Trade 1999) ("The only difference of significance . . . is that [the party seeking revocation] would bear the burden of persuasion in a changed circumstances review, but has no such burden in a sunset review."); see also 19 U.S.C. § 1675(b)(3)(A) (in changed circumstances review, party seeking revocation of an order shall have the burden of persuasion).   Because there is no presumption as to the likelihood of continuation or recurrence, it follows that there is no presumption that the countervailable subsidies will continue at the specific rate determined in the original investigation.

Rather than place a burden of proof on either the foreign or the domestic interested parties, the statute provides that parties may submit information in their response to Commerce's notice of initiation of review.  See 19 U.S.C. § 1675(c)(2) (notice of initiation requests interested parties to express their willingness to participate in the review, state the likely effects of revocation, and provide any "other information or industry data" as the agency may specify).   If no interested party responds, the order is revoked. See 19 U.S.C. § 1675(c)(3)(A).  The regulations further provide that in submitting a "substantive response," the parties must include, inter alia, "a statement regarding the likely effects of revocation of the order under review, which must include any factual information, argument, and reason to support such statement"; and "factual information, argument, and reason concerning the . . . countervailing duty rate . . . that is likely to prevail if the Secretary revokes the order . . . that the Department should select for a

---

[11](...continued)
or the [Subsidies and Countervailing Measures, or "SCM"] Agreement.  All that these agreements require is that national authorities periodically review an order or suspended investigations to determine whether the maintenance of the order or suspended investigation is necessary to remedy injurious dumping or countervailable subsidization.  In addition, we find no basis in either the statute or the agreements for placing the burden of proof on the domestic industry.")

particular interested party." 19 C.F.R. § 351.218(d)(3)(ii)(F), (G).  Under 19 C.F.R. §

351.218(d)(3)(iv)(B), "[a] substantive response from an interested party . . . also may contain any

other relevant information or argument that the party would like the Secretary to consider."  If a

response is deemed "inadequate," the likelihood determination may be issued based on "facts

available."  19 U.S.C. § 1675(c)(3)(B).[12]   In this case, the responses were deemed adequate and

Commerce proceeded to a "full sunset review."

The SAA distinguishes between a "full-fledged review" (or "full sunset review")

involving fact gathering, and an "expedited review based on facts available."  The SAA explains

the distinction as follows:

> The facts available may include prior agency determinations involving the subject
> merchandise as well as information submitted on the record by parties in response
> to the notice of initiation.  . . . [T]he agencies may decide separately whether
> responses are inadequate and whether to issue a determination based on the facts
> available without further fact-gathering.  [Section 1675(c)(3)] is intended to
> eliminate needless reviews.  . . .  If parties provide no or inadequate information in
> response to a notice of initiation, it is reasonable to conclude that they would not

---

[12]  The Uruguay Round Agreements Act, Statement of Administrative Action ("SAA"),
H.R. Doc. No. 103-316, at 879 (1994), explains that the extent of Commerce's obligations in
conducting a sunset review depends on the parties' responses to the notice of initiation:

> Under new section [1675(c)(3)(A)], if there is no response from domestic
> interested parties to the notice of initiation, Commerce will revoke the order or
> terminate the suspended investigation within ninety days of the initiation of the
> review.  Under new section [1675(c)(3)(B)], if there is inadequate response to a
> notice of initiation by foreign and domestic interested parties, Commerce and the
> Commission will conduct an expedited review based on the facts available and
> will issue final determinations within 120 days and 150 days, respectively, of the
> initiation of the review.

The SAA represents "an authoritative expression by the Administration concerning its views
regarding the interpretation and application of the Uruguay Round agreements . . . ." SAA at 656.
"It is the expectation of the Congress that future Administrations will observe and apply the
interpretations and commitments set out in this Statement." Id.

provide adequate information if the agencies conducted a full-fledged review. However, when there is sufficient willingness to participate and adequate indication that parties will submit information requested throughout the proceeding, the agencies will conduct a full review.

SAA at 879-80.  Thus, even in an "expedited review based on facts available," Commerce is to rely on information from prior determinations as well as from submissions by the parties in the sunset proceedings.  See also 19 C.F.R. § 351.308(f) ("[w]here the Secretary determines to issue final results of sunset review on the basis of facts available, the Secretary normally will rely on: (1) calculated countervailing duty rates or dumping margins, as applicable, from prior Department determinations; and (2) Information contained in the parties' substantive responses to the Notice of Initiation . . . .").[13]

It stands to reason, then, that in a "full review," Commerce must engage in an analysis that is at least somewhat more searching than simply continuing to apply the CVD rate determined in the original investigation for particular subsidies without considering evidence proffered by the parties that would support making adjustments thereto.  In addition, pursuant to its "fact-gathering" obligation in a full sunset review, Commerce may solicit more information as necessary.  The court finds that Commerce did not fulfil its obligations pursuant to a full sunset review because it failed to consider adequately the evidence on the record, or to seek additional evidence necessary to make its determination.

1. Allocation of Benefits under the CIG:  Evidence relating to Preussag

In the Preliminary Sunset Determination, Commerce stated:

---

[13] At oral argument, Commerce argued that Commerce's obligations under a "full sunset review" are unlike those of the Commission.  Commerce maintained that the essential distinction is that only Commerce conducts administrative reviews to set duty rates for specific past periods. This distinction has no real implication for sunset review, which serves a predictive function.

> Because the Department determined that CIG is a non-recurring program and that Preussag received the grant as late as in 1990, regardless of [Germany's] claim that CIG was terminated in 1985, or the EC's claim that the program no longer exists, based on the 15 year allocation period used by the Department in its investigations, we preliminarily determine that benefit streams from this program continue beyond the end of this sunset review and that, therefore, a countervailable subsidy from CIG to manufacturers/exporters of subject merchandise will continue to exist.

Preliminary Sunset Determination at § I.1. In the sunset determination, Commerce determined that "certain manufacturers of the subject merchandise received some benefits from both the CIG and IPA after January 1, 1985." Sunset Determination at cmt. 7 (citing Dillinger's October 15, 1999 Rebuttal Brief). Commerce's reasoning seems to be as follows: given that the program had been deemed nonrecurring, and Plaintiffs concede that amounts were given under the program as late as 1990; it follows that allocating these amounts over 15 years would cause benefits to continue beyond the end of sunset review. The issue raised in the Rebuttal Brief, however, was whether the amounts given after 1985 were more properly expensed in the year they were received.[14] Commerce did not reach this issue because it determined that it lacked the information necessary to determine the exact amounts given. The information, however, was readily available in Preussag's questionnaire submitted in the original investigation, and Plaintiffs satisfied their evidentiary burden by requesting that Commerce consider the amounts specified therein. Therefore, the court rejects Commerce's explanation that it lacked the information necessary to determine whether the amounts given after 1985 were de minimis, and

---

[14] In the Rebuttal Brief, Dillinger had disputed the domestic producers' contention that a substantial portion of the nonrecurring assistance paid to Preussag was received after 1986. Plaintiffs indicated in the Rebuttal Brief that Preussag's questionnaire response in the original investigation showed that "99.4% of the Capital Investment Grants and 99.6% of the Investment Premium Act Grants given to Preussag were received prior to the end of the 1985/1986 fiscal year." Rebuttal Brief, P.R. Doc. 597, Pl. App. Tab 5, at 4 n.6.

instructs Commerce to consider the information on the record to determine whether the amounts

should be allocated over time or expensed in the year received.

      2. De Minimis Net Subsidy Rate: Calculation Memoranda

Plaintiffs contend that with respect to corrosion-resistant carbon steel flat products, the

calculation memoranda from the original investigation show that under Commerce's

methodology for allocating non-recurring subsidies, and applying a discount rate of 8%, the

benefit of the subsidies given under the CIG would decline by at least 3.6% annually,

diminishing to a rate of 0.26% by 2000 (rather than the 0.39% calculated by Commerce in the

original investigation and retained by Commerce in the sunset review). See 19 C.F.R. §

351.524(d) (providing a formula for allocating a non-recurring benefit over time and determining

the annual benefit amount that should be assigned to a particular year). Under Plaintiffs'

calculations, adjusting the amount attributable to the CIG program in the original investigation

would result in a de minimis net subsidy rate of 0.41% in the sunset review for all programs

combined.[15] Similarly, Plaintiffs maintain that if Commerce applied its methodology for

allocating benefit streams over time, it would have found that the CVD rate attributable to the

IPA for cut-to-length carbon steel flat products (0.06%) would decline by over 32% by 2000.[16]

---

[15] Plaintiffs urge that, for the purpose of sunset review, Commerce should deem a countervailable subsidy rate of less than 1.0% AV as de minimis, rather than 0.5% AV according to post-URAA law. See 19 U.S.C. § 1671b(b)(4)(A). According to the regulations, however, the change to a 1.0% AV de minimis rate affects only preliminary or final determinations. See 19 C.F.R. § 351.106(b). Section 351.106(c) specifies that "[i]n making any determination other than a preliminary or final antidumping or countervailing duty determination in an investigation . . . the Secretary will treat as de minimis any weighted-average dumping margin or countervailable subsidy rate that is less than 0.5% AV, or the equivalent specific rate."

[16] The statute specifies that a de minimis net countervailable subsidy "shall not by itself

(continued...)

In the Preliminary Sunset Determination, Commerce indicated that there were inconsistencies in the evidence regarding whether the CIG would continue to provide countervailable benefits beyond the end of sunset review. Preliminary Sunset Determination at § I.1. The German producers requested that Commerce make the calculation memoranda from the original investigation part of the administrative record of the sunset review. Commerce rejected this request as untimely. Commerce stated that "[i]nsofar as Dillinger could have submitted some version [e.g., a public version] of the memoranda in the sunset reviews, we determined that . . . Dillinger did not file the information in a timely manner." Sunset Determination at cmt.4.

The record from the original investigation may be incorporated into the record for purposes of the sunset review. See Floral Trade Council v. United States, 13 CIT 242, 243, 709 F. Supp. 229, 230 (1989) ("in a case . . . where the agency in its decision states without qualification that it has examined 'the original investigations' . . . the court must assume that all relevant information from those previous investigations is before the agency for the purpose of the current decision."). Further, in the past, even in an expedited sunset review Commerce apparently has accepted untimely submissions relating to "important factual information that is already on the record of this [sunset review] proceeding, i.e., in the [prior] administrative review segment." See Iron Metal Castings from India, 64 Fed. Reg. 37,509, 37,511 (Dep't Comm.

---

[16](...continued)
require the administering authority to determine that revocation of a countervailing duty order or termination of a suspended investigation would not be likely to lead to continuation or recurrence of a countervailable subsidy." 19 U.S.C. § 1675a(b)(4). See also SAA at 889 (delineating criteria for a no likelihood determination where there is evidence of de minimis benefits). Plaintiffs concede that Commerce is not bound by a finding pursuant to sunset review that the net countervailable subsidy would be de minimis, but maintain that in this case Commerce failed to fulfil its obligation to make such a finding. Commerce has not indicated any case in which an affirmative likelihood determination was made in spite of a de minimis finding.

1999) (amd'd final sunset review determ.).

Thus, it is sufficient that Plaintiffs alerted the agency in their substantive response or rebuttal to the other interested parties' substantive response that the countervailable benefits accruing from the nonrecurring subsidies would be de minimis. The court finds that the issue was raised with sufficient clarity to put Commerce reasonably on notice in a timely manner that it needed to consider the data underlying the calculation of the original CVD rate. See Rebuttal Brief, P.R. Doc. 597, Pl. App. Tab 5, at 4 ("[I]t is clear that none of the recurring subsidies reviewed by the Department in the original investigation would provide any meaningful countervailable benefit that continues after the end of this review."). To the extent Commerce needed information beyond these calculation memoranda, it could have requested the information from the parties or from a third source. Accordingly, Commerce shall consider the calculation memoranda as part of the record in this proceeding.[17]

**B. Scope of Commerce's Discretion to make Adjustments**

1. Framework for Inquiry

Commerce maintains that, even if it considers the evidence described above, it is restricted from making adjustments to the net countervailing duty rates determined in the original investigations where no administrative review has been conducted. As a preliminary matter, the statute does not explicitly prevent any adjustments from the original CVD rate. Rather, the

---

[17] Plaintiffs also argue that Commerce's rule that parties cannot submit factual information after the first 35 days of a sunset review proceeding violates the parties' rights under the WTO Subsidies Agreement to have an ample opportunity to present all relevant evidence in writing. Because the court finds that Commerce failed to fulfil its statutory obligation by not considering the calculation memoranda, the issue of compliance with the Subsidies Agreement need not be reached.

statute sets up a framework for inquiry in making the likelihood determination.   Section

1675a(b)(1) directs Commerce in a sunset review to consider:

> A.  The net countervailable subsidy determined in the investigation and subsequent reviews; and
> B.  Whether any change in the program which gave rise to the net countervailable subsidy described in subparagraph A has occurred that is likely to affect that net countervailable subsidy.

That Commerce shall "consider" the original CVD rate does not, by itself, indicate that

Commerce may not make adjustments thereto.  It does not necessarily follow from a statutory

directive for an agency to consider certain facts, that the agency may not consider *other* facts.

Indeed, the second required consideration provides that Commerce shall determine whether

adjustments are necessary based on "changes in the program."   The SAA specifies, however,

that where benefits are allocated over time, "Commerce will consider whether the fully allocated

benefit stream is likely to continue after the end of the review, without regard to whether the

program that gave rise to the long-term benefit continues to exist."    SAA at 889.  See also

Sunset Policy Bulletin at § III.A.4.   Thus, a non-recurring subsidy, though terminated, may

factor into Commerce's likelihood determination where the benefits accruing therefrom are

allocated beyond the sunset review period.  This provision, however, does not absolve

Commerce of its obligation to "consider" the original CVD rate in light of facts and arguments

raised by the parties in exercising their right to participate in a sunset review.

2.  Selection of CVD Rate

The statute indicates that Commerce is to provide the Commission with the net

countervailable subsidy that is "likely to prevail" if the order is revoked, and that Commerce

"shall normally choose a net countervailable subsidy that was determined under [19 U.S.C. §

1671d regarding final determinations] or [19 U.S.C. § 1675(a) regarding administrative reviews,

or § 1675(b)(1) regarding changed circumstances reviews]." 19 U.S.C. § 1675a(b)(3). The

SAA explains that – in light of the directive under section 1675a(b)(3) that Commerce provide

the Commission with the net countervailable subsidy that is "likely to prevail" – it may be more

appropriate in certain instances for Commerce to choose a CVD rate other than that derived in

the original investigation. The SAA provides the following guidance:

> The Commission may consider likely . . . net countervailable subsidies to be relevant to its analysis of the likelihood of injury. [Section 1675a(b)(3)] direct[s] Commerce to provide the Commission with the net countervailable subsidies . . . likely to prevail in the event of revocation or termination. Commerce normally will select . . . net countervailable subsidies determined in the original investigation or in a prior review. The Administration intends that Commerce normally will select the rate from the investigation, because that is the only calculated rate that reflects the behavior of exporters and foreign governments without the discipline of an order or suspension agreement in place. In certain instances, a more recently calculated rate may be more appropriate.[18]

---

[18] The Sunset Policy Bulletin parallels the language of the SAA, and reads as follows:

The Department normally will provide to the Commission the net countervailable subsidy that was determined in the original investigation. However, the purpose of the net countervailable subsidy in the context of sunset reviews is to provide the Commission with a rate which represents the countervailable rate that is likely to prevail if the order is revoked or the suspended investigation is terminated.

[Section 1675a(b)(1)(B)] of the act provides that the Department will consider whether any change in the program which gave rise to the net countervailable subsidy determination in the investigation or subsequent reviews has occurred that is likely to affect the net countervailable subsidy. Consequently, although the SAA at 890, and the House Report at 64, provide that the Department normally will select a rate from the investigation, this rate may not be the most appropriate if, for example, the rate was derived (in whole or in part) from subsidy programs which were found in subsequent reviews to be terminated, there has been a program-wide change, or the rate ignores a program found to be countervailable in a subsequent administrative review.

(continued...)

SAA at 890. That Commerce will "normally select" a net countervailable subsidy calculated in

the original investigation or a prior review does not in any way indicate that Commerce is

"barred" from making adjustments thereto based on information gathered in a sunset review. In

this case, Commerce does not argue that the original rate should be used because it better predicts

future behavior. Rather, it emphasizes the inconvenience of conducting a broader sunset review

instead of an ordinary administrative review to determine a proper rate. The SAA contemplates

that "in certain instances" Commerce may select a rate other than the one derived in the original

investigation. The SAA does not limit the instances in which another selection may be "more

appropriate," nor does it explicitly prevent adjustments from being made pursuant to a sunset

review. Accordingly, Commerce has far more discretion than it admits.

    3. <u>Extraordinary Circumstances</u>

    The SAA cautions, however, that the requirement that Commerce provide the

Commission with net countervailable subsidy that is "likely to prevail" in the event of revocation

is not to be construed as directing Commerce to calculate a "future net countervailable subsidy."

The SAA reads as follows:

> In providing information to the Commission, the Administration does not intend
> that Commerce calculate future . . . net countervailable subsidies, because such an
> exercise would involve undue speculation . . . . Only under the most
> extraordinary circumstances should Commerce rely on . . . net countervailable
> subsidies other than those it calculated and published in its prior determinations.

SAA at 890-91.[19] <u>See also</u> 19 C.F.R. § 351.218(e)(2)(i) ("Even where the Department conducts a

---

[18](...continued)
Sunset Policy Bulletin at § III.B.3.

[19]    The regulations parallel the language of the SAA. Section 351.218(e)(2)(i) of the
(continued...)

full sunset review, only under the most extraordinary circumstances will the Secretary rely on a CVD rate . . . other than those it calculated and published in its prior determinations . . . .").  The implications of this limitation are not as broad as Commerce urges.  This passage in the SAA regarding "future net countervailable subsidies" indicates that Commerce should not attempt to calculate a CVD rate based on subsidies not yet in existence.  The final sentence directs Commerce not to consider subsidy allegations it has not yet passed on.  It cannot be read as a limit on needed adjustments to an outstanding rate, because section 1675a(b)(1)(B) expressly requires consideration of program changes.  The SAA's limitations on findings as to the future existence of subsidies or unreviewed subsidies say nothing about restricting Commerce's discretion to adjust the original CVD rate as envisioned by the general principles immediately preceding them.  By adjusting an existing CVD rate, Commerce does not cease to rely on it.  It does not abandon it for an entirely new subsidy calculation.  In fact, in accordance with the statute, Commerce adjusted certain rates here because it apparently deemed some recurring subsidies terminated (i.e., the Structural Improvement Aids and the Zonal Border Area programs), or found non-recurring subsidies inapplicable to the classes of merchandise under review in this case (i.e., the Ruhr District Action program).  Indeed, the SAA indicates that Congress contemplated that Commerce is to engage in some fact gathering when conducting a

---

[19](...continued)
regulations reads as follows:

> Even where the Department conducts a full sunset review, only under the most extraordinary circumstances will the Secretary rely on a CVD rate . . . other than those it calculated and published in its prior determinations . . . .

19 C.F.R. § 351.218(e)(2)(i)

full sunset review.  See discussion, supra, at Section I.A.  Such fact gathering would be pointless

if Commerce were prohibited from considering those facts in order to determine whether

adjustments to the original CVD rate are warranted.  Accordingly, Commerce is not restricted by

the statute or the SAA from making adjustments to the original CVD rate in the absence of a

separate subsequent determination.[20]

### 4. Policy Bulletin

Commerce seeks support from the Sunset Policy Bulletin for its refusal to make

adjustments in the absence of an administrative review.  The Sunset Policy Bulletin contains a

non-exclusive list of examples of circumstances in which Commerce may or may not make

adjustments to the original net countervailable rate.  Sunset Policy Bulletin at § III.B.3.

Example (g) indicates that "[w]here the Department has not conducted an administrative review

of the order, or suspension agreement, as applicable, subsequent to the investigation, except as

provided in paragraph III.C[21], the Department normally will not make adjustments to the net

---

[20] Of course, it does not follow from the principles described above that in all sunset reviews Commerce *must* make adjustments to the original CVD rate.  Commerce has the discretion to decide when an adjustment would aid in reaching a more accurate determination of the net countervailable subsidy likely to prevail.  See Neenah Foundry Co. v. United States, 142 F. Supp. 2d 1008 (Ct. Int'l Trade 2001) (citations omitted).  The court in Neenah Foundry noted that the word "may" suggests even wider discretion than other provisions in the regulations which state that the agency "normally will" or "normally will not" change the rate in a given situation.  Id. at 1026. The court found that Commerce did not abuse its discretion in not making an adjustment to reflect a more recent administrative review where there was a "rational connection between the facts found and the choices made in the agency's methodology for determining the net countervailable subsidy."  Id. at 1027-28.  In this case, Commerce's avoidance of fact finding based on its misapprehension of the scope of sunset review precludes the court from making a determination with respect to a "rational connection."

[21] Paragraph III.C parallels section 1675a(b)(2) of the statute and generally states that if the Department determines that "good cause" is shown, it will also consider (1) programs

(continued...)

countervailable subsidy rate determined in the original investigation." Id. at § III.B.3.g. To the extent that Commerce interprets Example (g) as completely foreclosing any adjustments other than those specified in § 1675a(b)(2)(A) or (B) simply because no administrative review has been conducted, the court finds no support for such a restriction in the statute, the regulations or the SAA. In fact, the court finds that such an interpretation of Example (g) would directly conflict with the SAA and the statutory scheme, and is therefore impermissible. See 19 U.S.C. § 1675a(b)(1)(B) and, supra, discussion I.B.2 & 3. Cf. Pesquera Mares Australes Ltda. v. United States, 266 F.3d 1372, 1380-84 (Fed. Cir. 2001) (according deference to Commerce's interpretation of statute where interpretation arising out of a "relatively formal administrative procedure" constituted "a permissible construction of the statute.").

   5. Verification

Commerce explains that it rejected the information submitted by the Plaintiffs in part because of a "preference" for verified information. Commerce stated that it typically does not conduct investigations in sunset reviews, and only rarely conducts on-site verifications. Commerce further explained that given the "unusually stringent" time constraints, it would be "unreasonable and burdensome" to require Commerce to conduct an investigation as extensive as that of an administrative review. DOC Br. at 23. Commerce's arguments lack merit.

Commerce does not dispute that the information in the calculation memoranda and Preussag's questionnaire had been verified in the original investigation. Rather, Commerce's concern seems to be that in a sunset review, it is impracticable to verify that no subsidies were

---

[21](...continued)
determined to provide countervailable subsidies in other investigations or reviews under certain circumstances, or (2) programs newly alleged to provide countervailable subsidies.

given to companies other than Preussag under the CIG and/or IPA programs after the POI (1991),

or that Preussag in fact received after this date only 0.6% of the total amount given.[22]  This

concern seems unwarranted, given that Defendant-Intervenors have not pointed to any evidence

that subsidies were given under these programs after 1991 to any company other than Preussag,

or that Preussag in fact received more than Plaintiffs allege.  Defendant-Intervenors merely

speculate that "[o]ther companies may have received more."  Def.-Int. Br. at 17.  Commerce is

also apparently concerned that it would be unable to verify any of the additional facts that may be

necessary to determine a CVD rate under current laws and methodologies described in Section II,

infra.  Commerce cannot justify its failure to consider Plaintiffs' arguments based on its

conjecture that this information might be unavailable or otherwise incapable of being verified.

Commerce is correct that it is not obligated in all sunset reviews to verify factual

information relied upon in making its final determination.  According to the regulations, it is

within Commerce's discretion to verify information prior to issuing the final results pursuant to

sunset review, although once a determination to revoke is made, verification is mandatory.  See

19 C.F.R. § 351.307 ("Prior to making a final determination in an investigation or issuing final

results of review, the Secretary *may* verify relevant factual information.  . . . [T]he Secretary *will*

verify factual information upon which the Secretary relies in . . . a revocation under [19 U.S.C. §

_____

[22] Commerce argues as follows:  "Dillinger's assumption that the subsidy rate at issue
would have fallen below de minimis by the end of the sunset reviews is flawed.  In fact the
opposite may be true.  Given that Commerce allocates subsidies over sales, it is possible, for
example, that the subsidy rates could have actually increased over the period between the original
issuance of the orders and the sunset reviews, depending on sales value each year since 1993.
[T]his is another reason why Commerce normally performs this type of analysis only in the
context of an administrative review."  DOC Br. at 24.  Presumably, sales values since 1993
would be readily available to Commerce had it requested submissions regarding this information.

1675(d)].” (emphasis added).  See also  19 U.S.C § 1677m(i)(2) (“The administering authority

shall verify all information relied upon in making . . . a revocation under section 1675(d).”).[23]

Cf. 19 U.S.C. § 1676m(i)(3) (requiring verification in an administrative review only if requested

by an interested party, and, unless good cause is shown, if no verification was made during the

two preceding administrative reviews).

    The regulations further indicate that it is within Commerce’s discretion to verify

information it receives in a full sunset review if it determines that such verification is “needed.”

See 19 C.F.R. § 351.218(f)(2)(i) (Commerce “will verify factual information relied upon in

making its final determination normally only in a full sunset review . . . and only where

needed.”).  Although the regulations describe limited circumstances in which Commerce will

typically verify information,[24] Commerce does not contend that a party might be prejudiced if it

chooses to conduct a verification when these circumstances are not present.

    Even if Commerce were prohibited from conducting verification in a full sunset review,

Commerce still must analyze the submitted evidence to determine the proper weight it should be

given.  See Floral Trade Council v. United States, 20 CIT 595, 601 (1996).  The lack of an

---

[23] Section 1677m(i)(2) does not distinguish between revocations under section 1675(d)(1) (revocations pursuant to administrative or changed circumstances review) and those under section 1675(d)(2) (revocations pursuant to sunset review).  See Final Rule, 62 Fed. Reg. 27,296 at § 351.218.

[24] The regulation also indicates that “[t]he Department will conduct verification normally only if, in its preliminary results, the Department determines that [1] revocation of the order or termination of the suspended investigation, as applicable, is not likely to lead to continuation or recurrence of a countervailable subsidy or dumping . . . and [2] the Department's preliminary results are not based on countervailing duty rates or dumping margins, as applicable, determined in the investigation or subsequent reviews.” 19 C.F.R. § 351.218(f)(2)(i).

obligation to conduct verification in a sunset review does not relieve Commerce of its obligation to consider and weigh information submitted by the parties in support of arguments reasonably made as to why revocation would or would not be likely to continue or recur beyond the end of sunset review.

Accordingly, Commerce on remand must consider the evidence proffered by both parties and the Government of Germany.

## II. Adjustments Pursuant to Changes in Law and Methodology

Plaintiffs claim that Commerce erred in failing to consider any changes in U.S. or international law occurring since the original investigation that affect the previously investigated subsidies. Plaintiffs contend that failure to consider these changes contravenes the purpose of a sunset review, i.e., determining the net countervailable subsidy that is likely to prevail if the countervailing duty order is revoked. Specifically, Plaintiffs assert that Commerce erred in not considering changes in law relating to: (1) a Commission of the European Communities decision putting limitations on aid to the steel industry;[25] (2) the passage of the Uruguay Round

---

[25] Commission Decision No. 2496/96/ECSC (Dec. 18, 1996) established Community rules for State aid to the steel industry. This decision specified that "any aid in any form whatsoever and whether specific or non-specific which Member States or their regional or local authorities might grant to their steel industries is prohibited pursuant to Article 4 (c) of the Treaty." The rules issued pursuant to this decision allow for an exemption regarding regional investment aid for disadvantaged regions in certain Member States, which has now been limited to Greece, provided that that the total aid does not exceed ECU 50 million and the aided investment does not lead to an increase in production capacity. All other regional investment aid is now prohibited. Previously, Art. 5 had allowed for exemptions for aid granted to steel undertakings located in the territory of the former German Democratic Republic provided that the aid is accompanied by a reduction in the overall production capacity of that territory.

Agreements Act with provisions rendering certain subsidies non-actionable[26]; (3) a change in

U.S. regulations governing contingent liability interest-free loans[27]; and (4) a GATT dispute

settlement panel decision regarding private bank debt forgiveness.[28]  Plaintiffs also allege that

Commerce should have taken into account the following changes in Commerce's methodologies

---

[26] Article 8.2(b) of the WTO Subsidies Agreement contains the greenlight category "subsidies to disadvantaged regions."  To qualify, the region must be considered "disadvantaged on the basis of neutral and objective criteria which in turn measure the level of economic development in the region."  It is also required that measures of economic development be based on either per capita income and GDP (no disadvantaged region can exceed 85% of the national average) or unemployment rates (which must be 110% of the national rate) over a three year period.  Finally, the criteria cannot favor certain regions beyond what is appropriate for the elimination or reduction of regional disparities within the framework of the regional policy.
          Current section 1677(5B) of the statute parallels the Subsidies Agreement categories of noncountervailable subsidies.  The statute reads in relevant part as follows: "[a] subsidy provided, pursuant to a general framework of regional development, to a person located in a disadvantaged region within a country shall be treated as non-countervailable, if it is not specific . . . within eligible regions" and if certain conditions are met. 19 U.S.C. § 1677 (5B)(C).

[27] The new section governing contingent liability interest-free loans is 19 C.F.R. § 351.505(d)(2), which reads as follows:  "If, at any point in time, the Secretary determines that the event upon which repayment depends is not a viable contingency, the Secretary will treat the outstanding balance of the loan as a grant received in the year in which this condition manifests itself." Section 351.504 explains the application of this new provision:  (a) Benefit. In the case of a grant, a benefit exists in the amount of the grant. (b) Time of receipt of benefit. In the case of a grant, the Secretary normally will consider a benefit as having been received on the date on which the firm received the grant. (c) Allocation of a grant to a particular time period . . ."  In this case, the Secretary allocated the benefit from the SVK assistance to a time period of 15 years.  Therefore, since the assistance would then have been paid to SVK in 1985, if the assistance given to SVK is considered a non-viable contingency it would not continue to provide benefits beyond the end of the sunset review.  It is not clear whether there are sufficient facts for Commerce to determine if the contingency at issue is viable or not.

[28] In its substantive response, Dillinger urged Commerce to consider the findings of a GATT Dispute Settlement Panel.  See Pl. App. Tab 3 at 4 (citing United States – Imposition of Countervailing Duties on Certain Hot-Rolled Lead and Bismuth Carbon Steel Products Originating in France, Germany and the United Kingdom:  Report of the Panel ¶ 404 (Oct. 14, 1994)).  Dillinger explained that the Panel had "determined that the debt forgiveness by private banks was not a subsidy and that the United States 'had acted inconsistently with Articles 1 and 4:2 of the Agreement when it treated the debt forgiveness as countervailable subsidies.'" Id.

regarding: (1) the calculation of "average useful life"; and (2) change-in-ownership.

## A. Changes in Law

As discussed in Section I.B, supra, with respect to whether adjustments could be made to the original CVD rate in light of facts and arguments raised by the parties, Commerce determined that an administrative review, rather than a sunset review, was the appropriate context within which Plaintiffs could seek relief as to a change in the duty rate calculated in accordance with changes in applicable laws and regulations.[29] In the Sunset Determination, Commerce stated:

> [A]lthough the sunset segment is created by the WTO agreement and thus follows post-WTO provisions, laws, or regulations, we do not consider that it is appropriate for the Department to retroactively change its previous results (especially those of the original investigation) based on new provisions, laws, or regulations. If respondents had desired that post-WTO changes in the law regarding the identification and quantification of subsidies be taken into account, they could have requested an administrative review subsequent to changes in the applicable laws and regulations, but they did not. Therefore, we determine that there is no basis to reject the Department's earlier findings in an investigation due to subsequent changes in methodology because such changes do not invalidate the Department's findings under the prior methodology especially where, as here, there has been no administrative review.

Sunset Determination at cmt. 14.

As Commerce misapprehends the purpose and scope of a sunset review, its concerns regarding the consideration of changes in law are misplaced. Under a sunset review, Commerce is to determine as accurately as possible whether countervailable subsidies are likely to continue or recur. Sunset reviews are "inherently prospective." See Ad Hoc Comm. of Domestic

---

[29] Administrative reviews conducted after January 1, 1995 – the effective date of the Uruguay Round Agreements Act ("URAA"), Pub. L. No. 103-465, 108 Stat. 4809 (1994) – apply post-URAA law. See FAG Kugelfischer Georg Schafer AG v. United States, 131 F. Supp. 2d 104 (Ct. Int'l Trade 2001) (reviewing administrative review applying antidumping statute as amended, the where administrative review was initiated after December 31, 1994, even though original investigation pre-dated URAA).

Uranium Producers v. United States, 162 F. Supp. 2d 649, 654 (Ct. Int'l Trade 2001) (likening

ITC's sunset review to threat of material injury determination).  See also Matsushita Elec. Indus.

Co. v. United States, 750 F. 2d 927, 933 (Fed. Cir. 1984) (finding that given "inherently

predictive" nature of review investigation, "Commission must assess, based on currently

available evidence and on logical assumptions and extrapolations flowing from that evidence, the

likely effect of revocation of the antidumping order on the behavior of the importers.").[30]  By

requesting that Commerce consider changes affecting the original CVD rate, Plaintiffs are not

asking Commerce to "reject" its findings under the original investigation, or to change

"retroactively" the results of the original or subsequent investigations.   A revocation order issued

pursuant to sunset review would apply to imports entered after the effective date of such order.

This is not a retroactive application.

        As a result, this case does not present the type of retroactivity problems at issue in Melex

USA v. United States, 19 CIT 1130, 899 F. Supp. 632 (1995).   There, the court held that

assessment of antidumping duties for entries that took place before revocation of the injury

determination was authorized under the antidumping statute, but that methodologies under the

amended statute should not have been retroactively applied to prior entries.  In that case, the

Department of Treasury made a finding of dumping in 1975.  Melex, 19 CIT at 1131, 899 F.

Supp. at 634.   Later, the Commission conducted a changed circumstances review, and on June

11, 1980, determined that the domestic industry would not be threatened with material injury if

the antidumping order were revoked.  Id.  Commerce subsequently issued a notice of revocation,

_____

        [30] Although these sunset review cases involve the role of the Commission, there is no
reason why the prospective nature of sunset review should not hold true for reviews by
Commerce.

but specified that unappraised entries made prior to June 11, 1980 were unaffected. Id. In 1991, the exporters requested an administrative review regarding entries made prior to June 10, 1980. With respect to these entries, Commerce determined that the exporters sold the merchandise at less-than-fair-value. Melex, 19 CIT at 1132, 899 F. Supp. at 635. The exporters appealed, claiming that because the antidumping duty order was revoked in 1980, Commerce could not assess duties on the pre-1980 entries. Melex, 19 CIT at 1133, 899 F. Supp. at 636. The court rejected this argument, holding that "a revocation of a determination of injury is prospective in that it does not revoke the determination of injuries for entries prior to the effective date of the revocation." Id. Thus, the court allowed for a review of the pre-1980 unliquidated entries, notwithstanding the 1980 revocation order. Nevertheless, the court found that Commerce erred in applying current law in the 1992 administrative review of the pre-1980 entries. The court reasoned that "the application of the 1979 and 1984 amendments to entries made prior to the effective dates of those amendments would be the retroactive application of those amendments which is not clearly required by statutory language, legislative history or administrative practice." Melex, 19 CIT at 1138, 899 F. Supp. at 639. In this case, Plaintiffs are not seeking application of the current legal regime to imports already entered into the U.S. to obtain an adjustment of duties already paid. In this case, the likelihood determination involves whether subsidies would be likely to continue or recur, thereby having an effect on imports entered after the effective date of the potential revocation order.

The statute directs Commerce to consider "any change in the program" that is likely to affect the original CVD rate. 19 U.S.C. § 1675a(b)(1)(B). Although the statute leaves undefined the term "change in the program," the SAA indicates that Commerce is to consider whether the

subsidy programs have been "continued, modified, or eliminated." SAA at 888. The SAA thus contemplates that pursuant to a sunset review, Commerce is to consider changes in foreign law that affect the program. By its nature, then, a sunset review is designed to account for changes in law that have a bearing on whether countervailable subsidies will continue or recur. A sunset review does not provide for recalculation of the original CVD rate such that duties on entered imports that were subject to the order must be revised retroactively. It stands to reason, however, that how Commerce views a particular subsidy under current practices and regulations will bear on its determination of the likelihood that the subsidy will continue or recur beyond the end of sunset review.

In addition, the court finds no support for Commerce's tacit imposition of a requirement that an interested party participating in a sunset review must have first requested and completed an administrative review.[31] Administrative reviews may not be available for several reasons. For example, under 19 C.F.R. § 351.213(d)(3), an administrative review may be rescinded based on a finding that "during the period covered by review, there were no entries, exports, or sales of the subject merchandise." In this case, Commerce does not dispute that none of the German producers, except Dillinger, made any shipments of subject merchandise since the issuance of countervailing duty orders in 1993, or that Dillinger's last shipment in 1995 pre-dated the changes in law at issue in this case. Commerce suggests that the Plaintiffs could have made a token shipment to the United States in order to avoid rescission under 19 C.F.R. § 351.213(d)(3).

---

[31] This is not to say, however, that a sunset review must be as extensive as an administrative review. Although in some cases a sunset review may be more restrictive than an administrative review, Defendant Intervenors have not demonstrated any prejudice that would arise from the imposition of an adjusted CVD rate pursuant to the more thorough review that is warranted in this case.

Nothing in the statute requires such machinations in order to obtain a meaningful sunset review.

Thus, Commerce is not barred from considering changes in the foreign or U.S. laws described above, or from considering facts underlying these changes, which may or may not have taken place after the imposition of the original CVD order. Commerce must consider and give a reasoned explanation in response to material and reasonable arguments as to why a change in U.S. or foreign law would or would not have an impact on the likelihood of continuance or recurrence of the subsidies under review. See SAA, at 892, reprinted in 1994 U.S.C.C.A.N. at 4216 ("the agencies must specifically reference in their determinations factors and arguments that are material and relevant, or must provide a discussion or explanation in the determination that renders evident the agency's treatment of a factor or argument."). If Commerce chooses to exercise its discretion not to apply these changes in law, or decide that the facts do not warrant an adjustment, it must state its reasons in its likelihood determination. It is insufficient to decline consideration of any change in law subsequent to the original determination simply based on the supposed limitation on the scope of a sunset review, as such considerations are inherent in making the likelihood determination required in the sunset review. Commerce will therefore determine on remand whether, if at all, adjustments are warranted based on the points raised by the Plaintiffs in their substantive response and subsequent submissions. The court takes no position on the cited changes as these matters are not ripe for review.

**B.  Current Methodologies**

Commerce concedes that it applies current law in administrative reviews, but that an exception should be made for sunset reviews. There is no reason for making such a distinction.

Under the historical and statutory notes to 19 U.S.C. § 1671, the 1994 URAA amendments "shall take effect on [January 1, 1995], and apply with respect to . . . reviews initiated under section 1675," which includes administrative, changed circumstances and sunset reviews. Furthermore, there is no indication in these notes that Commerce or the Commission should distinguish between review of an order entered pursuant to an investigation that took place after the URAA amendments, and those that took place before. The general principle seems to be, therefore, that current law governs any review under section 1675 irrespective of the date of issuance of the order under review. It follows from this principle that Commerce is not barred from applying current methodologies in a sunset review. Indeed, Defendant-Intervenors concede that "if [Commerce] must consider subsequent changes in law in a sunset review, then [it] must consider its new regulations as well." Def.-Int. Br. at 33.

### 1. AUL Calculation Methodology

Commerce maintains that even if it were appropriate to consider its current methodologies in a sunset review, it would not change its average useful life (AUL) calculation from the original investigation. Commerce asserts that according to its past practice, where a company's AUL previously has been calculated in an investigation, it will use the same AUL calculation in a subsequent review notwithstanding any change in methodology, provided the same subsidies are again being investigated, and in the absence of any new evidence. Plaintiffs argued in the sunset proceedings that Commerce should not continue to apply a 15-year allocation period from the IRS Class Life Depreciation Tables rather than the more specific 11-year period contained in the German depreciation schedule. Plaintiffs urged Commerce to

reevaluate the 15-year allocation period in light of the following:  (1) Commerce's current regulations require it to use an allocation period based upon a country-wide depreciation rate if that rate differs from the IRS tables by more than one year;[32] and (2) findings in an investigation that the applicable allocation period from the German depreciation schedule for productive assets in the German steel industry was found to be 11-years.  See Steel Wire Rod, 62  Fed. Reg. at 54,991.

Administrative practice does not detract from the general principle described above. Commerce has applied methodologies in administrative reviews that were instituted in accordance with the court's decisions issued subsequent to the original investigation.  Commerce has also refrained from doing so where circumstances of a case warrant, such as when the application of current law would not lead to more accurate results.  For example, the investigations in Certain Hot-Rolled Lead and Bismuth Carbon Steel Products from the United Kingdom, 63 Fed. Reg. 18,367, 18,369 (Dep't Comm. 1998) (final adm. review), stand in

---

[32] Under 19 C.F.R. § 351.524(d)(2), an interested party may overcome the presumption that the average useful life (AUL) is to be calculated according to the IRS depreciation tables by establishing that (1) the tables do not "reasonably reflect" the company-specific or country-specific rate, and (2) the difference is "significant."   19 C.F.R. § 351.524(d)(2) reads in relevant part as follows:

> The Secretary will presume the allocation period for non-recurring subsidies to be the AUL of renewable physical assets for the industry concerned as listed in the Internal Revenue Service's ("IRS") 1977 Class Life Asset Depreciation Range System  . . . . The presumption will apply unless a party claims and establishes that the IRS tables do not reasonably reflect the company-specific AUL or the country-wide AUL for the industry under investigation, subject to the requirement . . .  that the difference between the company-specific AUL or country-wide AUL for the industry under investigation and the AUL in the IRS tables is significant. If this is the case, the Secretary will use company-specific or country-wide AULs to allocate non-recurring benefits over time.

contrast to those in <u>Certain Cut-to-Length Carbon-Quality Steel Plate from France</u>, 64 Fed. Reg.

73,277 (Dep't Comm. 1999) (final adm. review).  In the former case, Commerce applied an

allocation methodology based on company-specific average useful life data in accordance with

<u>British Steel v. United States</u>, 929 F. Supp. 426, 439 (Ct. Int'l Trade 1996).  Commerce

specifically rejected the respondent's request to apply the method for calculating average useful

life according to the IRS tables as had been done in the original investigation.  Commerce chose

the rate derived under the current methodology, reasoning that applying different allocation

periods for the same subsidies in two different proceedings involving the same company would

generate significant inconsistencies.  <u>Id.</u>

In the latter case, by contrast, Commerce continued to allocate subsidies that had been

countervailed in prior cases according to the company-specific AUL assigned to the same

subsidies in those prior cases based on the POI.  The respondent had requested that Commerce

apply the current methodology of calculating the company's AUL in each year that a subsidy is

provided.   64 Fed. Reg. at 73,293 cmt. 13.  Commerce rejected this argument, reasoning that

recalculating the AUL under the current methodology would be "extremely burdensome" and not

necessarily accurate where the company-specific AUL proposed by the respondents derived from

an on-going investigation.   <u>Id.</u>   In contrast, Commerce found that the AUL from the prior

investigation was "reasonable and accurate as possible without being burdensome."  <u>Id.</u>  At the

same time, Commerce applied its new discount policy under 19 C.F.R. § 351.524 because the

discount rate derived therein was "more realistic" and would result in a "better measure of the

subsidy."  <u>Id.</u>  Thus, under its own practices, Commerce may choose or not choose to apply

current law in a review as circumstances warrant.   In this case, Commerce has made no findings

pursuant to sunset review with respect to whether application of current methodologies as

applied in Steel Wire Rod would result in a more accurate CVD rate.

In the Sunset Determination, Commerce refused to apply the methodology and findings in

Steel Wire Rod because "in this review we are dealing with different companies and a different

set of subsidies." Sunset Determination at cmt. 7, n.32.   On appeal, Commerce reiterates this

statement without making factual findings relating to Plaintiffs' assertions that (1) Steel Wire

Rod involved the SVK assistance at issue in this case, and (2) Commerce had found in the

Preliminary Sunset Determination that "DHS and Dillinger remained, for all intents and

purposes, the same entities as the pre-privatization Saarstahl/DHS."  Preliminary Sunset

Determination at I.10-13.  As it is not the court's role to make findings in this regard, Commerce

must do so on remand.

### 2.  Change-in-Ownership Methodology

Plaintiffs argue that Commerce erred in continuing to apply its change-in-ownership

methodology found "illegal" by the U.S. Court of Appeals for the Federal Circuit and the WTO

Dispute Settlement Body.[33]  Plaintiffs contend that had Commerce applied its current change-in-

---

[33] With respect to cut-to-length plate, the countervailing duty rate determined in the
original investigation was 14.84%.  Of this amount, 14.63% related to subsidies applied to
Dillinger (the "SVK assistance") using Commerce's original change-in-ownership methodology.
Since the issuance of the Final Determination, a WTO Appellate Body Report and a decision of
the U.S. Court of Appeals for the Federal Circuit found that Commerce's change-in-ownership
methodology was not in accordance with the statute.  See United States - Imposition of
Countervailing Duties on Certain Hot-Rolled Lead and Bismuth Carbon Steel Products
Orginating in the United Kingdom, WT/DS138/AB/R ("UK Lead Bar"), and Delverde, SrL v.
United States, 202 F.3d 1360, 1367 (Fed. Cir. Feb. 2, 2000), reh'g granted in part and denied in
part (June 20, 2000) (Delverde III) (vacating decision by Court of International Trade and
instructing to remand for Commerce to determine based on "facts and circumstances" of asset
purchase whether respondent received an indirect subsidy).  The Federal Circuit rejected

(continued...)

ownership methodology in this case, the country-wide subsidy rate in the Cut-to-Length Plate

proceeding would have fallen from 14.84% to 0.21%. Commerce determined that it was "not

appropriate" to reach the privatization issue for purposes of sunset review. Commerce explained

that:

> Both the Appellate Body and CAFC decisions were issued relatively late in this
> proceeding. A sunset review is not the appropriate proceeding in which to examine a
> complicated privatization transaction and to consider a new privatization methodology.
> In light of the complexity and fact-intensive nature of this issue, it is imperative that the
> issues be fully developed on the record.

Commerce argues that the sunset review schedule does not allow it time to analyze the

complex factual issues that would be revisited by an analysis of a change in law. Commerce

ignores the statutory provision that it may seek an extension of time for "extraordinarily

complicated" sunset reviews. See 19 U.S.C. § 1675(c)(5)(C). See also 19 C.F.R. § 351.218

(f)(3)(ii) ("If the Secretary determines that a full sunset review is extraordinarily complicated

under section 751(c)(5)(C) of the Act, the Secretary may extend the period for issuing final

results by not more than 90 days."). Indeed, the statute specifically provides that Commerce

may treat a review as "extraordinarily complicated" if it is a review of a transition order. See 19

U.S.C. § 1675(c)(5)(C)(v). In any event, as Plaintiffs proposed that a change-in-ownership

methodology consistent with current law be applied to facts already on the record, it is not

apparent to the court why Commerce was unable to make any necessary adjustments within the

---

[33](...continued)
Commerce's practice of applying an irrebuttable presumption that the benefit of subsidies
provided to one company "passes through" to the purchasers of that company regardless of
whether the sale represented an arm's length transaction consistent with commercial
considerations. Id. at 1368.

time requirement of the statute.[34]   If Commerce deemed the issues raised by the Plaintiffs to

warrant a more thorough analysis or more extensive fact gathering, it could have sought

additional time, but did not do so.   Commerce cannot justify its decision not to address the

issues raised by the parties simply on the basis that the issues arise in the context of a sunset

review and the stringent time limits involved, especially when Commerce does not avail itself of

the mechanisms provided for by its own regulations.

     3.  <u>Evidence relating to Methodologies</u>

Plaintiffs also argue that Commerce abused its discretion in removing from the record the

German producers' March 14 and March 17 submissions.  Plaintiffs make the following

contentions:   (1) Commerce acted inconsistently in not rejecting the domestic producers'

November 9, 1999, and March 16, 2000 post-rebuttal comments, and allowing the domestic

producers to submit "new factual information" (namely, copies of questionnaire responses from

the original investigation) as late as April 28, 2000, <u>see</u> P.R. Doc. 763, Pl. App. Tab 12; and (2)

Commerce had already accepted the submissions, as is evidenced by Commerce's references in

the Preliminary Sunset Determination to the issues raised therein.  Commerce responds that there

were no inconsistencies in its rejection of submissions where:  (1) its return of the March 14

submission rendered the domestic producers' March 16, 2000 response "moot and irrelevant"

and it did not consider it for the purposes of the Sunset Determination; and (2) the domestic

producers' accepted submission dated November 9, 1999, related to its adequacy determination

---

[34] It is not clear what methodology Commerce would apply.  See <u>Allegheny Ludlum Corp. v. United States</u>, No. 99-09-00566, (Slip Op. 02-01) 2002 WL 15690 at *9 (Ct. Int'l Trade Jan 4, 2002) (rejecting Commerce's change-in-ownership methodology); <u>Acciai Speciali Terni S.p.A. v. United States</u>, No. 99-06-00364 (Slip Op. 02-10) (Ct. Int'l Trade Feb 1, 2002) (same).

and was therefore timely in fact.  DOC Br. at 42-43.   Commerce also explained in the Sunset

Determination that in fact it did not rely on the March submissions in the Preliminary Sunset

Determination.[35]

There is no statutory "deadline" for Commerce to reject a submission in a sunset review.

Nevertheless, once Commerce has accepted a submission, in certain cases it may be improper

and/or prejudicial for it to remove the submission from the record.   Commerce is presumed to

consider the evidence on the record in making its determinations.   At the time of the preliminary

sunset determination in this case, Commerce had not yet rejected the German producer's

submission. Thus, the court must presume that it considered the German producers' March 14,

2000, and March 17, 2000 submissions as well as the domestic producers' March 16 submission

in making its preliminary sunset determination.  The court further finds an inexplicable

inconsistency in Commerce's subsequent rejection of the German producers' submission while

failing to do the same with the domestic producers' March 16, 2000, and April 28, 2000

submissions.[36]  The argument that the unequal treatment of the parties concerns a moot issue is a

post hoc argument and does not explain Commerce's behavior.  In evaluating the changes in

methodology described above, Commerce shall consider the evidence submitted by the parties

relating thereto.

---

[35] Commerce stated that it "discussed certain issues in its preliminary determination because either the issues were raised in interested parties' substantive responses, rebuttal comments, or the Department obtained the relevant information on its own."  Sunset Determination at cmt. 6.

[36] Commerce is correct, however, that the domestic producers' November 9, 1999 submission related to its adequacy determination and was therefore timely.  See Sunset Procedures at § 351.309(e)(ii) (allowing 70 days from the notice of initiation to comment on adequacy determinations).

**Conclusion**

Accordingly, Commerce's determination pursuant to sunset review is remanded. Commerce cannot act irrationally and arbitrarily. It cannot accept Domestic Parties' "late" submissions and reject those of respondents. It cannot make some adjustments to an original CVD rate and then state it will not consider evidence of other adjustments because all adjustments are barred. It cannot avoid applying changes in the law because it is burdensome or inconvenient. Certainly, Commerce has a difficult task in deciding whether subsidies will continue or recur. It can streamline its procedures to some degree, but it must conduct meaningful sunset reviews. It has great discretion, but it must comply with the statute and explain its decisions. It cannot erect barriers simply to avoid considering complicated problems.

_____
Jane A. Restani
Judge

DATED:  New York, New York

This 28th of February, 2002.

**ERRATUM**

<u>AG der Dillinger v. United States</u>, Court No. 00-09-00437, Slip Op. 02-25, dated February 28, 2002.

     In the third line on page 27, replace the word "revocation" with the word "subsidies."