Slip Op. 02-107

# UNITED STATES COURT OF INTERNATIONAL TRADE

|  |  |  |
|---|---|---|
| AG der DILLINGER HÜTTENWERKE, EKO STAHL GmbH, SALZGITTER AG STAHL und TECHNOLOGIE, STAHLWERKE BREMEN GmbH, and THYSSEN KRUPP STAHL AG, | : | |
| | : | |
| Plaintiffs, | : | |
| | : | |
| v. | : | |
| | : | Court No. 00-09-00437 |
| THE UNITED STATES, | : | |
| | : | |
| Defendant, | : | |
| | : | |
| v. | : | |
| | : | |
| BETHLEHEM STEEL CORPORATION, and UNITED STATES STEEL LLC | : | |
| | : | |
| Defendant-Intervenors | : | |

[ITA's countervailing duty sunset redetermination remanded.]

Dated: September 5, 2002

DeKieffer & Horgan (J. Kevin Horgan and Marc E. Montalbine) for plaintiffs.

Robert D. McCallum, Jr., Assistant Attorney General, David M. Cohen, Director, A. David Lafer, Senior Trial Counsel, Commercial Litigation Branch, Civil Division, United States Department of Justice, (John C. Einstman), Boguslawa B. Thoemmes and Edna Boyle-Lewicki, Office of the General Counsel, United States Department of Commerce, of counsel, for defendant.

Dewey Ballantine LLP, (John A. Ragosta and John W. Bohn) for defendant-intervenors.

**OPINION**

**RESTANI, Judge:**

This matter comes before the court following its decision in AG der Dillinger Hüttenwerke v. United States, 193 F. Supp. 2d 1339 (Ct. Int'l Trade 2002) [hereinafter "Dillinger I"], in which the court remanded the final results of the full sunset reviews in Certain Corrosion-Resistant Carbon Steel Flat Products; Cold-Rolled Carbon Steel Flat Products; and Cut-to-Length Carbon Steel Plate Products from Germany, 65 Fed. Reg. 47,407 (Dep't Commerce Aug. 2, 2000) (final determ. upon sunset review) [hereinafter "Sunset Determination"], to the Department of Commerce ("Commerce" or the "Department") with instructions: (1) "to consider adequately the evidence on the record, or to seek additional evidence necessary to make its [likelihood] determination" pursuant to sunset review, Dillinger I, 193 F. Supp. 2d at 1348; (2) to "consider and give a reasoned explanation in response to material and reasonable arguments as to why a change in U.S. or foreign law would or would not have an impact on the likelihood of continuance or recurrence of the subsidies under review," Id. at 1359; and (3) to determine whether, if at all, adjustments to the countervailing duty ("CVD") rate are warranted and to make "findings pursuant to sunset review with respect to whether application of current methodologies . . . would result in a more accurate CVD rate." Id. at 1359-61. The court now reviews the Department's Results of Redetermination Pursuant to Court Remand (Dep't Commerce Apr. 30, 2002) [hereinafter "Remand Determination" or "Redetermination"].

## JURISDICTION AND STANDARD OF REVIEW

The court has jurisdiction pursuant to 28 U.S.C. § 1581(c) (2000).  The court will uphold Commerce's determination in countervailing duty investigations unless it is "unsupported by substantial evidence on the record, or otherwise not in accordance with law."  19 U.S.C. § 1516a(b)(1)(B) (2000).

## FACTUAL & PROCEDURAL BACKGROUND

On September 1, 1999, Commerce initiated sunset reviews of CVD orders on certain corrosion-resistant and cut-to-length steel products from Germany.[1]  Initiation of Five-Year ("Sunset") Reviews of Antidumping and Countervailing Duty Orders or Investigations of Carbon Steel Plates and Flat Products, 64 Fed. Reg. 47,767 (Dep't Commerce Sept. 1, 1999). Having deemed the responses adequate, Commerce decided to conduct a "full sunset review." Dillinger I, 193 F. Supp. 2d at 1347-48; see also Certain Corrosion-Resistant Carbon Steel Flat Products; Cold-Rolled Carbon Steel Flat Products; and Cut-to-Length Carbon Steel Plate Products From Germany, 65 Fed. Reg. 16,176 (Dep't Commerce Mar. 27, 2000) (prelim. determ. upon sunset review) [hereinafter "Preliminary Sunset Determination"].

On August 2, 2000, Commerce published the final results pursuant to sunset review.  In the Sunset Determination, Commerce determined that revocation of the countervailing duty

---

[1] The orders were originally entered following the petitions filed by the domestic steel industry, Bethlehem Steel Corporation and United States Steel LLC (collectively "Domestic Producers"), with Commerce on June 30, 1992, alleging that the Government of Germany ("Germany") was providing countervailable subsidies to its steel industry through various subsidy programs.  On July 9, 1993, after conducting a CVD investigation, Commerce issued a final affirmative determination, concluding that countervailable benefits had in fact been provided by Germany to the German steel companies under investigation. See Certain Steel Products from Germany, 58 Fed. Reg. 37,315 (Dep't Commerce July 9, 1993) (final determ.) [hereinafter "Final Determination"].

orders would be likely to lead to continuation or recurrence of countervailable subsidies. Sunset

Determ. at 47,408. Commerce found, inter alia, that certain manufacturers of the subject

merchandise received "some benefits" from both the non-recurring Capital Investment Grants

("CIG") and the Investment Premium Act ("IPA") programs after January 1, 1985. Therefore,

applying a fifteen-year allocation period to these programs, Commerce determined that benefit

streams from the CIG and IPA programs continue beyond the end of sunset review. Issues and

Decision Memo for the Sunset Reviews of the Countervailing Duty Orders on Certain

Corrosion-Resistant Carbon Steel Flat Products; Cold-Rolled Carbon Steel Flat Products; and

Cut-to-Length Carbon Steel Plate Products from Germany, 65 ITA Doc. 47,407 at cmt.7 (Dept.

Commerce Aug. 2, 2000) (final results) [hereinafter "Issues and Decision Memo"], summarized

in Sunset Determ., 65 Fed. Reg. 47,407. Commerce declined to make certain adjustments to the

rates determined in the original determination attributable to these programs because no

administrative reviews of the orders had been conducted.[2] Commerce did make other

adjustments to the net subsidy rate by deducting subsidy rates attributable to other programs it

found to have been terminated. Id.

On February 28, 2002, finding that "Commerce is not restricted by the statute or the

SAA from making adjustments to the original CVD rate," the court remanded the Sunset

Determination for Commerce to reconsider its determination that revocation of the CVD orders

---

[2] The German producers had argued that the benefits received under the CIG and/or IPA after that date were so small that they should be expensed in the year they were received. Commerce rejected this argument on the ground that "the record of these sunset reviews is not sufficient for us to definitively conclude whether [those benefits] were less than 0.5 percent of the corresponding beneficiary's annual net sales. . . ." Issues and Decision Memo at cmt.7. Commerce stated that "since no administrative reviews of the orders were conducted, we are unable to determine whether any additional benefits under these programs were received subsequent to the period of investigation." Id.

at issue would be likely to lead to the continuation or recurrence of countervailable subsidies. Dillinger I, 193 F. Supp. 2d at 1353, 1363. The court found that, in the Sunset Determination, "Commerce did not fulfill its obligations pursuant to a full sunset review because it failed to consider adequately the evidence on the record, or to seek additional evidence necessary to make its determination." Id. at 1348. Specifically, the court instructed Commerce to consider the information on the record and the calculation memoranda from the original investigation to determine whether the amounts given under the CIG and IPA programs after 1985 should be allocated over time or expensed in the year received. Id. at 1349-50.

The court also determined that because Commerce is not barred from considering changes in U.S. or foreign laws or applying current calculation methodologies, "Commerce must consider and give a reasoned explanation in response to material and reasonable arguments as to why a change in U.S. or foreign law would or would not have an impact on the likelihood of continuance or recurrence of the subsidies under review." Dillinger I at 1359 (citing Uruguay Round Agreements Act, Statement of Administrative Action, H.R. Doc. No. 103-316, at 892, reprinted in 1994 U.S.C.C.A.N. 4040, 4175-76) [hereinafter "SAA"]). With respect to changes in agency regulations, the court instructed Commerce to determine whether application of its current methodology for calculating an appropriate average useful life ("AUL") under 19 C.F.R. § 351.524(d)(2) would result in a more accurate CVD rate.[3] Id. at 1360-61. AG der Dillinger Hüttenwerke, EKO Stahl GmbH, Salzgitter AG Stahl und Technologie, Stahwerke Bremen GmbH, and Thyssen Krupp Stahl AG (collectively, the "German Producers" or "Respondents")

---

[3] This regulation provides that an interested party may overcome the presumption that the average useful life ("AUL") is to be calculated according to IRS depreciation tables by establishing that (1) the tables do not "reasonably reflect" the company-specific or country-specific rate, and (2) the difference is "significant." Dillinger I, 193 F. Supp. 2d at 1360 n.32.

had maintained that the determination to apply an eleven-year allocation period to "Subsidies Related to the creation of Dillinger Hutte Saarstahl AG, DHS" ("SVK grant") as applied to Saarstahl AG in Steel Wire Rod from Germany, 62 Fed. Reg. 54,990, 54,991 (Dep't Commerce Oct. 22, 1997) [hereinafter "Steel Wire Rod"], effectively rebutted the regulatory presumption of using the IRS depreciation tables (in this case, corresponding to a fifteen-year allocation period). The court therefore ordered Commerce to make "factual findings relating to the Plaintiffs' assertions that: (1) Steel Wire Rod involved the SVK assistance at issue in this case, and (2) Commerce had found in the Preliminary Sunset Determination that 'DHS and Dillinger remained, for all intents and purposes, the same entities as the pre-privatization Saarstahl/DHS.'" Dillinger I, 193 F. Supp. 2d at 1361 (quoting Issues and Decision Memo for the Sunset Reviews of the Countervailing Duty Orders on Certain Corrosion-Resistant Carbon Steel Flat Products; Cold-Rolled Carbon Steel Flat Products; and Cut-to-Length Carbon Steel Plate Products From Germany, 65 ITA Doc. 16,176 at 1(9) (Dep't Commerce Mar. 27, 2000) (prelim. results), summarized in Preliminary Sunset Determ., 65 Fed. Reg. 16,176).

On remand, Commerce determined that use of the eleven-year German steel-industry-wide AUL was warranted where: (1) the SVK assistance at issue in this case applied to both Saarstahl and Dillinger; (2) the eleven-year AUL Commerce applied to Saarstahl in Steel Wire Rod for allocating the SVK assistance rebutted the presumption in favor of using the fifteen-year AUL from the IRS tables; and (3) it was unable to determine a company-specific AUL for Dillinger. Remand Determ. at 13. Applying the eleven-year AUL, it found that no benefits under the SVK assistance or the CIG and IPA programs extended beyond the end of the sunset review. Id. at 8-9.

Nevertheless, Commerce determined that the benefit streams for the Joint Scheme and

Upswing East programs continued beyond the end of the sunset review.[4] Id. at 10. Commerce

also found that the German Producers had conceded that two recurring assistance programs

related to the European Coal and Steel Community (the "ECSC programs") -- i.e., "ECSC

Redeployment Aid under Article 56(2)(b)[5] and "Aid for Closure of Steel Operations"[6] -- would

---

[4] Commerce disagreed with Respondents' contention that these subsidies were not actionable at the time of the sunset reviews pursuant to 19 U.S.C. § 1677(5B)(C) (treating as noncountervailable subsidies to certain disadvantaged regions provided certain conditions are met). Commerce found that even if these subsidies were treated as non-countervailable, the non-countervailable status of these programs would have expired by June 1, 2000, which is prior to the end of the sunset review, and therefore, to the extent that these programs continued to provide benefits beyond those dates, those benefits are actionable. Remand Determ. at 9. Commerce found that Domestic Industry provided evidence that Ilsenburg received benefits under these programs as late as 1991. Id. at 9-10.

[5] In the Final Determination, Commerce described the ECSC Redeployment Aid under Article 56(2)(b) as follows:

> Under Article 56(2)(b) of the ECSC Treaty, persons employed in the iron, steel, and coal industries who lose their jobs may receive assistance for social adjustment. This assistance is provided to workers affected by restructuring measures, particularly workers withdrawing from the labor market into early retirement and workers forced into unemployment. The ECSC disburses assistance under this program on the condition that the affected country makes an equivalent contribution. Payments were made to German steel workers under Article 56(2)(b).

Final Determ. at 37,320. Based on its determination that German steel companies and their workers were aware when they negotiated their social plans that the German government would pay a portion of the costs, Commerce determined that one half of the amount paid by the Government of Germany constituted a countervailable subsidy. Id.

[6] Based on two laws, Aid for Closure of Steel Operations is a non-recurring program created to reduce the economic and social costs of plant closings in the steel industry between 1987 and 1990. See Preliminary Sunset Determ., 65 Fed. Reg. at 16,178. In the Final Determination, Commerce described the measures as follows:

> First, pursuant to the Rules on Providing Funds to Iron and Steel Companies to Give Social Assistance for Structural Adjustment, adopted on May

continue to provide benefits beyond the end of sunset review.  Accordingly, Commerce

determined that "revocation of the [CVD] orders on corrosion-resistant and [cut-to-length] plate

would be likely to lead to the continuation or recurrence of a countervailable subsidy."  Id.

Commerce adjusted the net countervailable subsidy rate from the 1993 Final

Determination to account for these terminated programs.  Commerce thus deducted from the

investigation rates the rates attributable to the terminated SVK assistance, as well as the CIG and

the IPA programs, resulting in the following adjusted rates for corrosion-resistant carbon steel

flat products:  0.15 percent (country-wide); for cut-to-length steel plate products, 0.80 percent

(Ilsenburg), 0.04 percent (Preussag), 0.15 percent (TKS), and 0.00 percent (country-wide).

Notwithstanding these adjustments, Commerce found that it was unable to determine the actual

net countervailable rates likely to prevail if the CVD orders were revoked, citing a lack of

information and time to make such a determination.  Remand Determ. at 11.

Both the German Producers and the Domestic Producers dispute aspects of the Remand

Determination.

---

3, 1988, the federal and state governments provided grants to the iron and steel
industry for expenses incurred with respect to displaced employees. This program
was administered by the Federal Ministry of Economics and the equivalent state
ministry.  The total amount of federal and state aid provided to steel companies
was not permitted to exceed 50 percent of a company's net expenditures incurred
as a result of these plant closings.
        Second, on June 27, 1988, the federal government adopted the
Guideline for Granting Aid to the Iron and Steel Industry.  This measure
increased the amount of aid provided to employees under Article 56(2)(b) of the
European Coal and Steel Community (ECSC) Treaty.

Final Determ., 58 Fed. Reg. at 37,318.

**DISCUSSION**

## I.  Contentions of the German  Producers

The German Producers argue that "Commerce erred in refusing to revoke the [CVD] order on corrosion-resistant flat products despite the fact that the [adjusted] subsidy rate was . . . de minimis."  Pls' Objection to Remand Determ. at 2.  With respect to cut-to-length carbon steel plate, the German Producers assert that in determining that it was unable to calculate a single rate applicable to Salzgitter, the successor to Ilsenburg and Preussag, Commerce violated the express instructions of the court when it refused to consider the calculation memoranda in reaching its Remand Determination.  Id. at 11-12.  Lastly, the German Producers assert that Commerce failed to consider and give a reasoned explanation in response to arguments that certain changes in U.S. and international law would have an impact on the likelihood of continuance or recurrence of the subsidies under review.  Id. at 13-14.

### A.  De Minimis Subsidy Rate

As described above, Commerce on remand made adjustments to the net countervailable subsidy rate, yet declined to consider the resulting rate as the rate that is "likely to prevail" if the CVD order is revoked, based on a lack of information on the record.  The German Producers contend that, in the Redetermination, Commerce impermissibly drew a distinction between adjusting the subsidy rate from the final results and determining the net countervailable subsidy rate likely to prevail if the countervailing duty order were revoked.   The German Producers argue that Commerce should have revoked the corrosion-resistant countervailing duty order on the grounds that:  (1) Commerce has failed to provide any justification as to why the adjusted

countervailing duty rate, which is substantially below the de minimis level of 0.5%,[7] should not be chosen as the rate "likely to prevail" if the order were revoked; (2) Commerce's contention that it lacks the information necessary to determine the subsidy rate likely to prevail upon revocation of the countervailing duty order lacks merit; and (3) there is no evidence that would justify an upward adjustment to the subsidy rate calculated in the original investigation.

Commerce responds that "Plaintiffs incorrectly claim that Commerce calculated a revised subsidy rate for corrosion-resistant steel that is de minimis," where it specifically stated in its Remand Determination that while it was able to make adjustments for the CIG, IPA, and SVK assistance programs, "'we are unable in this redetermination to determine the actual net countervailable rates likely to prevail' with respect to either corrosion-resistant steel or the [cut-to-length] steel plate, 'as the information to make such a determination is not on the record of these proceedings.'" Def. Response Br. at 6 (quoting Remand Determ. at 11). Commerce argues that even if it were able to determine the net countervailable rate likely to prevail, a de minimis rate "shall not by itself" require Commerce to revoke a CVD order. Commerce contends that "the continuation of two subsidy programs is a sufficient basis upon which Commerce may render an affirmative likelihood determination." Id. at 6-7.

---

[7]  See 19 U.S.C. § 1675a(b)(4)(B) (2000) ("[T]he administering authority shall apply the de minimis standards applicable to reviews conducted under [19 U.S.C. § 1675(a), administrative review, or (b)(1), changed circumstances]."); see also 19 C.F.R. § 351.106(c)(1) (2002) ("In making any determination other than a preliminary or final antidumping or countervailing duty determination in an investigation . . . the Secretary will treat as de minimis any weighted-average dumping margin or countervailable subsidy rate that is less than 0.5 percent ad valorem, or the equivalent specific rate.").

1. <u>Commerce's Obligation to Report the Subsidy Rate Likely to Prevail</u>

The court finds that Commerce failed to support with substantial evidence its determination not to choose the adjusted net countervailable subsidy calculated as the rate "likely to prevail" if the CVD order were revoked. Under the statute, Commerce shall provide the International Trade Commission (the "Commission") with the net countervailable subsidy that is "likely to prevail" if the order is revoked, and Commerce "shall normally choose a net countervailable subsidy that was determined under" 19 U.S.C. § 1671d regarding final determinations, 19 U.S.C. § 1675(a) regarding administrative reviews, or § 1675(b)(1) regarding changed circumstances reviews.[8] 19 U.S.C. § 1675a(b)(3). The court in <u>Dillinger I</u> specified, however, that simply because "Commerce will 'normally select' a net countervailable subsidy calculated in the original investigation or a prior review does not in any way indicate that Commerce is 'barred' from making adjustments thereto based on information gathered in a sunset review." 193 F. Supp. 2d at 1352. Thus, the court held that adjustments could be made to the original net countervailable subsidy, especially where, as here, an adjustment would aid in reaching a more accurate determination of the net CVD rate likely to prevail. See <u>id.</u> at 1354 n.20. Further, the SAA indicates that "[i]n certain instances, a more recently calculated rate *may be more appropriate.*" SAA at 890 (emphasis added).

The court did not hold that once adjustments are made, Commerce is bound to report the resulting rate to the Commission. Commerce may find for some reason that the rate it calculated or adjusted pursuant to sunset review would not be appropriate to report as the rate "likely to

---

[8] The SAA specifies that "Commerce normally will select the rate from the investigation, because that is the only calculated rate that reflects the behavior of exporters and foreign governments without the discipline of an order or suspension agreement in place." SAA at 890.

prevail" if the CVD orders were revoked. For example, Commerce may have credible evidence that the foreign government is likely to reinstate a particular subsidy program, or alter an existing program to enhance benefits received thereunder.

That Commerce has discretion to depart from the statutory directive of choosing a particular rate, however, does not mean that it is relieved of its obligation to justify its rejection of the net countervailable rate, either from the original investigation as adjusted, or as recalculated, as the case may be. Nor does it follow that Commerce may choose not to report to the Commission any rate whatsoever. The statute directs Commerce to "consider . . . the net countervailable subsidy determined in the investigation and subsequent reviews . . . ." 19 U.S.C. § 1675a(b)(1). Commerce does not comply with this obligation by declaring that a lack of information precludes it from considering the subsidy rate it adjusted pursuant to sunset review. See id.

The court also finds that Commerce improperly declined to consider whether data in the calculation memoranda would enable it to calculate the subsidy rate likely to prevail, reasoning that the time period for making its redetermination was insufficient. Commerce's reasoning is as follows:

> Even if we were to consider information contained in the calculation memoranda here, we would be unable to [determine the net countervailable rates likely to continue or recur]. We would have to solicit additional information from the [German Producers] concerning their sales, benefits received under the programs we know to have continued beyond the sunset review, and the new programs and benefits alleged by the domestic [producers]. We would then conduct verification, issue verification reports, issue a preliminary draft determination, allow a comment period, conduct a public hearing, if requested, and then issue the final redeterminations to the Court. The Court's instructions upon remand, and the time period specified by the Court for the completion of the redeterminations, do not envision such an exercise here.

Remand Determ. at 11.  Contrary to Commerce's assertions, the court specifically held that in this case Commerce may engage in more fact-gathering as necessary.  See Dillinger I, 193 F. Supp. 2d at 1348 ("pursuant to its 'fact-gathering' obligation in a full sunset review, Commerce may solicit more information as necessary.").  The court stated that Commerce shall consider the calculation memoranda as part of the record in this proceeding, and that "[t]o the extent Commerce needed information beyond these calculation memoranda, it could have requested the information from the parties or from a third source."  Id. at 1350.  Furthermore, the court found that "[a]ccording to the regulations, it is within Commerce's discretion to verify information prior to issuing the final results pursuant to sunset review, although once a determination to revoke is made, verification is mandatory."  Id. at 1355 (citing 19 C.F.R. § 351.307 and 19 U.S.C § 1677m(i)(2)).[9]

Thus, it is clear that the court ordered Commerce to analyze evidence on the record to calculate a subsidy rate that would be likely to prevail if the CVD orders were revoked, or solicit more information from the parties if such evidence was lacking.  If Commerce deemed verification necessary, it was within its discretion to conduct verification to the extent it

---

[9]  The statute requires that Commerce make its final sunset determination within 240 days after the date on which a review is initiated, and allows for extensions of not more than 90 days if the sunset review is "extraodinarily complicated."  See 19 U.S.C. § 1675(c)(5).  The court in Dillinger I also drew Commerce's attention to the statutory provision that specifically provides that Commerce may treat a review as "extraordinarily complicated" if it is a review of a transition order.  See Dillinger I, 193 F. Supp. 2d at 1362 (citing 19 U.S.C. § 1675(c)(5)(C)(v)).  The statute also provides that review of transition orders shall be completed not later than 18 months after the date such review is initiated.  See 19 U.S.C. § 1675(c)(6)(A)(ii).  By setting these time periods and means for extensions thereof, Congress apparently intended that something of substance be done in conducting sunset reviews.

considered appropriate.[10]  It is impermissible for the agency simply to state that there is not

enough time to conduct a thorough investigation and that verification or further proceedings may

be necessary.  Commerce could have explained to the court the necessary information it lacked

and requested an extension of time, but it did not do so.

Further, in this case, the Defendant-Intervenors attempted to submit information on new

subsidy programs that allegedly showed the German government's general policy of subsidizing

its steel industry.  Domestic Producers' Substantive Response on Corrosion-Resistant Flat

Products, at 6-8. Commerce rejected the Domestic Industry's request to consider the newly

alleged countervailable programs in the sunset reviews, reasoning that, "We do not consider the

fact that the seven-year old orders have not been subject to any administrative reviews and the

domestic interested parties' claim that the [Government of Germany] continues to subsidize

dying industries, without more concrete evidence, sufficient to constitute good cause."  Issues

and Decision Memo at cmt. 11.  See 19 U.S.C. § 1675a(b)(2)(B) (providing that Commerce may

consider evidence of new subsidies in a sunset review upon a finding of "good cause").  In the

Remand Determination, Commerce noted that, during the sunset review, it had chosen not to

address the new subsidy allegations "at the time." Remand Determ. at 10 n.10.

In responding to comments, however, Commerce stated, without citation:  "[A]s the

domestic interested parties point out, there is evidence on the record of the German

government's policy to subsidize its steel industry, particularly in what was formerly East

Germany." Remand Determ. at 15.  Thus, Commerce appeared to rely on the new subsidy

---

[10] The court also indicated that "[t]he regulations further indicate that it is within Commerce's discretion to verify information it receives in a full sunset review if it determines that such verification is 'needed.'" Dillinger I, 193 F. Supp. 2d at 1355 (citing 19 C.F.R. § 351.218(f)(2)(i)).

allegations as further support of its affirmative likelihood determination, without making a "good cause" determination pursuant to 19 U.S.C. § 1675a(b)(2)(B). Commerce does not indicate whether, subsequent to the Sunset Determination, it identified documents in the record that constitute "concrete evidence" of Germany's policy of subsidizing its steel industry. In the absence of any explanation of what constituted evidence of such a policy or that "good cause" existed to consider the previously rejected new subsidy allegations, the court finds that Commerce erred in relying on such vague, unsupported statements of a "policy" to subsidize the steel industry to avoid reporting adjusted rates. If Commerce finds that it did not allow for a full investigation of the domestic industry's contentions because of a standard which the court has rejected, it may consider its claim anew. Commerce must treat both sides fairly. This does not mean, however, that Commerce must investigate unsupported allegations.

In sum, if the agency is unable to calculate a subsidy rate that is "likely to prevail" based on the evidence on the record, it has two choices: (1) it may solicit information from the parties or third sources, if that is what is needed to report the net countervailable subsidy rate, as it existed or as adjusted or recalculated pursuant to its sunset review; or (2) it may revoke the CVD order, if it also is unable to arrive at an affirmative likelihood determination supported by substantial evidence.[11] Accordingly, Commerce's basis for not reporting to the Commission the subsidy rate it adjusted pursuant to sunset review is unsupported.

---

[11] "In the absence of an affirmative determination [that a countervailable subsidy would be likely to continue or recur], the statute directs that the countervailing duty order be revoked." Id. at 1346 (citing 19 U.S.C. § 1675(d)(2)).

2.  Affirmative Likelihood Determination Notwithstanding a De Minimis Rate

Commerce is correct that it is not bound to revoke a CVD order if the net countervailable subsidy is zero or de minimis.  Under 19 U.S.C. § 1675a(b)(4)(A), "a net countervailable subsidy [determined in the investigation and subsequent reviews] that is zero or de minimis shall not by itself require the administering authority to determine that revocation of a countervailing duty order or termination of a suspended investigation would not be likely to lead to continuation or recurrence of a countervailable subsidy."[12]  That Commerce is not bound to revoke a CVD order under such circumstances,  however, does not absolve Commerce of its obligation to support its ultimate determination with substantial evidence on the administrative record.  If Commerce chooses not to revoke a CVD order notwithstanding a zero or de minimis rate, it must make findings that would justify its decision.  The court finds that Commerce's finding that two subsidy programs continue is not supported by substantial evidence and therefore does not constitute a sufficient basis upon which Commerce may render an affirmative likelihood determination.

Commerce based its affirmative likelihood determination on the German Producers' putative concession that the ECSC programs "would not expire until 2002 and that German steel companies would receive benefits until it did."  Remand Determ. at 5, 10 (citing Response of

---

[12]  The SAA states that "Under [19 U.S.C. § 1675a(b)(4)(A)], the existence of a zero or de minimis countervailable subsidy at any time while the order was in effect shall not by itself require Commerce to determine that continuation or recurrence of countervailable subsidies is not likely."  SAA at 889.  The SAA indicates, however, that "if the combined benefits of all programs considered by Commerce for purposes of its likelihood determination have never been above de minimis at any time the order was in effect, and if there is no likelihood that the combined benefits of such programs would be above de minimis in the event of revocation or termination, Commerce should determine that there is no likelihood of continuation or recurrence of countervailable subsidies."  Id.  The parties do not contend that the combined benefits of all programs considered by Commerce have never been above de minimis.

German Producers to Notice of Initiation – Corrosion-Resistant Steel Flat Products from

Germany, Oct. 1, 1999, at 10).  Commerce omits that the German Producers indicated that to the

extent such programs would continue, they would do so at de minimis levels.  The record shows

that the German Producers represented to Commerce that:

> In its initial determination, the DOC concluded that 25 percent of Article 56(2)(b)
> payments constituted subsidies, resulting in net subsidies of 0.08 percent for
> corrosion-resistant steel. [Preliminary Determ.] at 37320-21.  While the German
> Group is of the opinion that Article 56(2)(b) payments to workers are akin to U.S.
> unemployment insurance and do not constitute countervailable benefits, should
> the DOC conclude otherwise, these benefits remain de minimis through 1999, and
> will continue to be de minimis in the future, regardless of whether these CVD
> orders are revoked.  Moreover, this program will automatically expire upon the
> termination of the ECSC in 2002.

Substantive Response of German Producers, at 10 (Oct. 1, 1999).  The Government of

Germany's substantive response makes similar representations as to changes in the programs

that reduce the amount of benefits distributable under the program.[13]  Commerce did not state

that the expiration of the programs is not automatic, or subject to extension.  Nor does

---

[13] The Government of Germany represented to Commerce that:

> [ECSC Redeployment Aid under Article 56(2)(b)] provided only minimal benefit
> of 0.08% to the companies reviewed by the Department during the investigation.  On
> March 25, 1998, the administrative regulations on granting aid for steel industry workers
> affected by measures under Article 56(2)(b) of the ECSC Treaty were amended to reduce
> the level of benefits and simplify the settlement procedures.  Essentially, the level of
> waiting allowance was reduced from 75%/85% of the last net pay to 20% of
> unemployment pay . . . .  The second major change was that the bridging aid is no longer
> reimbursed in the amount of 50% but is granted as a fixed amount . . . .  A copy of the
> March 25, 1998 administrative regulations is attached at Appendix 3.  This program will
> automatically expire upon termination of the ECSC in 2002.

Substantive Response of Government of Germany, at 7-8 (Sept. 28, 1999).  In the
Remand Determination, Commerce does not assess whether the amendments  described in the
submission would have an impact on the likelihood that the benefits received under these
programs would rise above de minimis levels in the future.

Commerce cite to any evidence in the record that would support a determination that the subsidy rate attributable to the ECSC programs would rise above <u>de minimis</u> levels in the future. It is not sufficient for Commerce merely to indicate the *possibility* that benefits could still be given under the program. Rather, Commerce must make factual findings that would indicate whether such benefits would be *probable,* considering how substantial the benefits are likely to be or whether they would continue for any significant time period beyond the end of sunset review . <u>See Usinor Industeel, S.A. v. United States</u>, Slip Op. 02-39 at 13 (Ct. Int'l Trade 2002) ("likely means likely -- that is, <u>probable</u>").[14] As Commerce has failed to make any assessment of the material arguments of the parties with respect to these programs, the court finds that Commerce's affirmative likelihood determination is not supported by substantial evidence.

Commerce states that according to the Sunset Policy Bulletin, "[c]ontinuation of a program will be highly probative of the likelihood of continuation or recurrence of countervailable subsidies." <u>Policies Regarding the Conduct of Five-year ("Sunset") Reviews of Antidumping and Countervailing Duty Orders</u>, 63 Fed. Reg. 18,871, 18,874 (policy bulletin) (Dep't Commerce Apr. 16, 1998) [hereinafter "Sunset Policy Bulletin]. <u>See</u> SAA at 888. Further, the Sunset Policy Bulletin states that where the benefits of a subsidy at issue are allocated over time, Commerce "will consider whether the fully allocated benefit stream is likely to continue after the end of the review, without regard to whether the program that gave rise to the long-term benefit continues to exist." Sunset Policy Bulletin, 63 Fed. Reg. at 18,874-75. <u>See</u> SAA at 889.

---

[14] This means more likely so than not. It is not simply a toss-up.

That continuation of a program may be "highly probative" of the likelihood of continuation or recurrence of countervailable subsidies does not absolve Commerce of assessing the arguments and alleged facts that would undercut its probative value. Clearly a subsidy program which is scheduled to terminate soon after the end of the sunset review and continues at a de minimis rate may not have the same probative value as one which is to last indefinitely at rates above de minimis. In other words, consistent with the Sunset Policy Bulletin and the SAA, a finding that a subsidy program or benefits stream continues beyond the end of the sunset review does not automatically lead to renewal of the CVD order.

The German Producers claim that Commerce's past practice is to make a negative likelihood determination based on evidence of a likely de minimis subsidy rate. Pls' Objection to Remand Determ. at 10 n.5 (citing Porcelain-on-Steel Cooking Ware from Mexico, 65 Fed. Reg. 284 (Dep't Commerce Jan. 4, 2000) (final results of sunset review) and Live Swine from Canada, 64 Fed. Reg. 60,301, 60,308 (Dep't Commerce Nov. 4, 1999) (final results of sunset review) ( "The Department finds that the net countervailable subsidy likely to prevail were the order revoked is de minimis. Therefore . . . revocation of the countervailing duty order would not be likely to lead to continuation or recurrence of a countervailable subsidy.")). The German Producers contend that Commerce has not pointed to any previous investigation in which it has made an affirmative likelihood determination notwithstanding the calculation of a de minimis subsidy rate.

Commerce attempts to distinguish its previous determinations on the ground that "in those reviews, there was sufficient information on the records to conclude that the programs that continued to exist from the investigation were likely to provide de minimis subsidies beyond the

end of sunset review," and that "there was no information on the records indicating that there were any additional programs that may have provided countervailable benefits beyond the end of sunset review." As described above, Commerce has the discretion to seek more information as necessary to make a determination as to the likelihood the continuing programs would provide subsidies above de minimis in the future. As Commerce is charged with making an *affirmative* likelihood determination to support the continuation of a CVD order, Commerce may not rely on the absence of evidence that the subsidies would not rise above de minimis.

**B. Calculation Memoranda**

In the Sunset Determination, Commerce noted that "although Salzgitter is a successor-in-interest for both Ilsenburg and Preussag, without an appropriate review, we cannot discern the appropriate rate for the successor. Therefore, for Ilsenburg and Preussag, we are reporting the rates from the original investigation, as adjusted." Sunset Determ. at 47,408 n.1.

On remand, Commerce determined a country-wide net countervailable subsidy of 0.15% ad valorem ("AV") for corrosion-resistant carbon steel flat products, and 0.00% AV (country-wide including Dillinger) for cut-to-length carbon steel plate. Remand Determ. at 11. Company-specific rates for producers of cut-to-length carbon steel plate were calculated at 0.80% AV for Ilsenburg, 0.04% AV for Preussag, and 0.15% AV for TKS. Id. The German Producers claim that Commerce erred in not analyzing the calculation memoranda because these memoranda would have enabled it to calculate a single subsidy rate for Salzgitter (a successor-in-interest for both Ilsenburg and Preussag) based on a combination of sales by Preussag and Ilsenburg before the original investigation. The German Producers further maintain that the

resulting subsidy rate "would certainly have been below the de minimis threshold." Pl. Objection to Remand Determ. at 12.

Commerce asserts that it did not review the calculation memoranda because its affirmative likelihood determination was based on "the continued existence, and provision of benefits under, two subsidy programs." Def. Response Br. at 5 (citing Remand Determ. at 12). The Defendant-Intervenors assert that the statute does not require, and the court did not intend to require, such a calculation, and that such a calculation would make any difference in Commerce's likelihood determination. Even if the change urged by the German Producers may not affect the ultimate likelihood determination, Commerce must still provide the Commission with the net countervailable rates likely to prevail. Therefore, if Commerce elects on remand to pursue the sunset review rather than revoke, it must decide what rates to report to the Commission and this likely would require it to determine whether a single rate for Salzgitter is warranted and, if so, what that rate is.[15]

### C. Changes in U.S. and Foreign Law

On remand, Commerce determined that Joint Swing and Upswing East programs applicable only to Ilsenburg in the cut-to-length plate investigation were countervailable notwithstanding the "green-light" provision Article 8.2(b) of the Agreement on Subsidies and Countervailing Measures ("SCM Agreement"). The German Producers allege that Commerce refused to consider other changes in international law, such as European Commission Decision

---

[15] The court notes that in the Preliminary Determination, Commerce was able to calculate company-specific rates for producers of cut-to-length steel plate products, taking into account the fact that certain companies were successors-in-interest for other companies. See Preliminary Determ. at 16,177 (assigning 1.62% AV for Salzgitter (as successor-in-interest for both Ilsenburg and Preussag), and 0.51% AV for TKS (as successor-in-interests of Thyssen)).

No. 2496/96/ECSC (Dec. 18, 1996) ("EC Decision") establishing rules prohibiting the granting of state aid to the steel industry. In Dillinger I, the court instructed Commerce to "consider and give a reasoned explanation in response to material and reasonable arguments as to why a change in U.S. or foreign law would not have an impact on the likelihood of continuance or recurrence of the subsidies under review," including the EC Decision. Dillinger I, 193 F. Supp. 2d at 1359 & 1356 n.25 (indicating that the EC Decision prohibited aid to steel industries by Member States or their regional or local authorities, except for in Greece under certain circumstances). Defendant-Intervenors allege that these rules "allow continued subsides under a variety of conditions and have historically had little restraining effect." Def.-Int. Br. at 7. Defendant-Intervenors further allege that subsidies increased notwithstanding the elimination of industrial subsidies in the Treaty of Paris, and that ECSC governments provided "75 billion Euros in direct aid to the steel industry in the last twenty years." Id. They also dispute the German Producers' claims with respect to the effect of the amendments to the two ECSC programs, and that the court must defer to Commerce's evaluation of the weight of the evidence.

In the Remand Determination, Commerce made no such evaluation of evidence that would be capable of meaningful review. Nor is it clear that the evidence cited by the Defendant Intervenors was on the record for Commerce to consider. As Commerce based its affirmative likelihood determination on its finding that the ECSC programs continue beyond the end of sunset review, Commerce was obligated to address whether the change in law cited by the German Producers has any impact on those programs. It is not sufficient for Commerce to state that particular changes in law would not affect its likelihood determination without having first analyzed those changes.

**II.  Contentions of the Domestic Industry**

The Domestic Producers argue that the court should not require Commerce to provide the

International Trade Commission with the "revised subsidy rates," because, although the court in

Dillinger I did create the possibility that Commerce on remand might examine subsidies given

subsequent to the POI, "[t]he court could not have meant to require that specific subsidies

already subject to a fifteen-year allocation be re-amortized over a different period."  Def.-Int. Br.

at 12.  The Domestic Producers explain that "[e]stablishing a [fifteen]-year benefit stream for a

subsidy (such as the 1989 debt write-offs in this investigation) means that one-fifteenth of the

countervailable subsidy is offset in each of the 15 years following bestowal," and that

"[p]rematurely curtailing the benefit stream after, say, 10 years means that one-third of the

countervailable subsidy is never subject to offset."  Id.  They claim that re-allocation of the

subsidies allocated in a prior determination will necessarily result in under-countervailing in

contravention of the requirement in 19 U.S.C. § 1671(a) that "a [CVD be] equal to the amount of

the net countervailable subsidy."  Id.

The Domestic Producers assume that the court made a decision as to whether AULs

should be changed for any purpose.  In fact, the court merely ordered Commerce to exercise its

discretion and assess the evidence and changes in the law.  They also assume that the application

of the eleven-year allocation period for the purpose of sunset review will result in an actual

reallocation of the subsidies allocated in the original determination, requiring a recalculation of

duties on entered imports.  The court in Dillinger I stated that:

> By its nature . . . a sunset review is designed to account for changes in law that
> have a bearing on whether countervailable subsidies will continue or recur.  A
> sunset review does not provide for recalculation of the original CVD rate such
> that duties on entered imports that were subject to the order must be revised

retroactively. It stands to reason, however, that how Commerce views a particular subsidy under current practices and regulations will bear on its determination of the likelihood that the subsidy will continue or recur beyond the end of sunset review.

193 F. Supp. 2d at 1358. On remand, Commerce has determined that the application of an eleven-year allocation period is appropriate for the purpose of determining the likelihood that a particular benefit will continue or recur beyond the end of sunset review. The parties cite nothing that says such a determination also changes existing rates applicable to past entries subject to the CVD order. Furthermore, the determinations cited by the Domestic Producers for the proposition that Commerce has a policy of declining to reallocate subsidy rates allocated in a prior determination are unavailing, as they are all ordinary, not sunset, administrative reviews.[16] Clearly, a change in the allocation period in an ordinary periodic administrative review will

---

[16] Specifically, the Defendant-Intervenors maintain that, in all these administrative reviews, Commerce refused to re-allocate previously allocated subsidies because:

> [If a subsidy has already been] countervailed based on an allocation period established in an earlier segment of the proceeding, it is not reasonable or practicable to reallocate those subsidies over a different period of time. . . . Such a practice may lead to an increase or decrease in the total amount countervailed and, thus, would result in the possibility of over-countervailing or under-countervailing the actual benefit. . . .

Def.-Int. Br. at 12-13 (quoting Industrial Phosphoric Acid from Israel, 64 Fed. Reg. 2879, 2880 (Dep't Commerce Jan. 19, 1999)); see also Certain Carbon Steel Products from Sweden, 62 Fed. Reg. 16,549, 16,549-50 (Dep't Commerce Apr. 7, 1997) (admin. rev.); Certain Cut-to-Length Carbon Steel Plate from Sweden, 62 Fed. Reg. 16,551, 16,552 (Dep't Commerce Apr. 7, 1997) (admin. rev.); Certain Hot-Rolled Lead and Bismuth Carbon Steel Products from the United Kingdom, 62 Fed. Reg. 16,555, 16,557-58 (Dep't Commerce Apr. 7, 1997) (admin. rev.); Pure Magnesium and Alloy Magnesium from Canada, 62 Fed. Reg. 13,863, 13,865 (Dep't Commerce Mar. 24, 1997) (prelim. admin. rev.); Pure Magnesium and Alloy Magnesium from Canada, 61 Fed. Reg. 52,435, 52,436 (Dep't Commerce Oct. 7, 1996) (prelim. admin. rev.); Certain Cut-to-Length Carbon Steel Plate from Sweden, 61 Fed. Reg. 51,683, 51,684 (Dep't Commerce Oct. 3, 1996) (prelim. admin. rev.).
        This is another reason why an ordinary administrative review does not provide Plaintiffs with the type of review they are entitled to here.

necessarily have an effect on the rates applied both before and after the review. That is, a new deposit rate is set and final assessments are made for the past entries under review.[17] In contrast, a sunset review is merely prospective. If, pursuant to a sunset review, the CVD order remains in place notwithstanding a recalculation of the allocation period for purposes of the sunset review, any actual reallocation could be addressed in an administrative review, if imports resume. Accordingly, the Domestic Producers' objections do not provide a basis for Commerce's failure to report the net countervailable rates likely to prevail to the Commission.

## CONCLUSION

Commerce has not fully complied with the court's instructions. Commerce cannot decline to calculate a subsidy rate that is likely to prevail if the order is revoked simply based on a perceived lack of time to make a thorough investigation. It is disingenuous for Commerce to assert that it does not made adjustments to the original CVD rate in the absence of subsequent administrative reviews, when in fact it had done so here prior to the court's review. Commerce cannot hide behind a claim that another type of review is required. In this case, administrative reviews cannot provide the relief requested here. Sunset reviews have a purpose of their own. If Commerce deems the remand adjustments not supported, then it should not make them. Its adjustment decisions must be rational. An affirmative likelihood determination cannot rest on the mere possibility that benefits may continue or recur in any substantial amount for any significant period of time beyond the end of sunset review. Given the crucial and even

---

[17] In this case, Commerce does not dispute that none of the German producers, except Dillinger, made any shipments of subject merchandise since the issuance of countervailing duty orders in 1993, or that Dillinger's last shipment in 1995 pre-dated the changes in law at issue in this case. See Dillinger I, a193 F. Supp. 2d at 1359. Thus, periodic administrative reviews were not a reasonable avenue to relief.

extraordinary changes in both domestic and foreign law since the original investigations,[18] there is a clear need for a realistic assessment of whether subsidies are likely to continue.

Therefore, Commerce must determine what specific information it needs to conduct a full sunset review and how long it needs to gather that information, and report these time requirements to the court within twenty days. If Commerce concludes that, overall, the countervailing duty rate is <u>de minimis</u> and that further data gathering and review would not lead to information undercutting the effects of a <u>de minimis</u> rate, Commerce shall revoke the countervailing duty order.[19] The affirmative sunset review redetermination before the court is not supported by substantial evidence.

_____
Jane A. Restani
Judge

Dated: New York, New York

    This 5th day of September, 2002.

---

[18] For example, there have been changes in U.S. privatization law, changes in international, European Union and German subsidies law, and changes in amortization regulations.

[19] At this point, the court cannot say that all parties are entitled to a <u>de minimis</u> rate because the privatization/successor-in-interest issues have not been addressed and it is unclear what the rate Salzgitter should receive if it is a successor to two companies, only one of which received a <u>de minimis</u> rate.